(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JONES *v.* MISSISSIPPI

### CERTIORARI TO THE COURT OF APPEALS OF MISSISSIPPI

No. 18–1259.  Argued November 3, 2020—Decided April 22, 2021

A Mississippi jury convicted petitioner Brett Jones of murder for killing his grandfather.  Jones was 15 years old when he committed the crime. Under Mississippi law at the time, murder carried a mandatory sentence of life without parole.  The trial judge duly imposed that sentence, which was affirmed on direct appeal.  This Court subsequently decided *Miller* v. *Alabama*, 567 U. S. 460, which held that the Eighth Amendment permits a life-without-parole sentence for a defendant who committed a homicide when he or she was under 18, but only if the sentence is not mandatory and the sentencer therefore has discretion to impose a lesser punishment.  In the wake of that decision, the Mississippi Supreme Court ordered that Jones be resentenced in accordance with *Miller*.  At the resentencing, the sentencing judge acknowledged that he had discretion under *Miller* to impose a sentence less than life without parole.  The judge determined, however, that life without parole remained the appropriate sentence for Jones.  Jones again appealed his sentence, citing both *Miller* and the then-recently decided case of *Montgomery* v. *Louisiana*, 577 U. S. 190, which held that *Miller* applied retroactively on collateral review.  Jones contended that, under *Miller* and *Montgomery*, a sentencer must make a separate factual finding that a murderer under 18 is permanently incorrigible before sentencing the offender to life without parole.  The Mississippi Court of Appeals rejected Jones's argument.

*Held*: In the case of a defendant who committed a homicide when he or she was under 18, *Miller* and *Montgomery* do not require the sentencer to make a separate factual finding of permanent incorrigibility before sentencing the defendant to life without parole.  In such a case, a discretionary sentencing system is both constitutionally necessary and constitutionally sufficient.  Pp. 5–22.

Syllabus

(1) A sentencer need not make a separate factual finding of permanent incorrigibility before sentencing a murderer under 18 to life without parole. In *Miller*, the Court mandated "only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing" a life-without-parole sentence. 567 U. S., at 483. And in *Montgomery*, the Court stated that "a finding of fact regarding a child's incorrigibility . . . is not required." 577 U. S., at 211. *Miller* and *Montgomery* require consideration of an offender's youth but not any particular factual finding. *Miller* and *Montgomery* therefore refute Jones's argument that a finding of permanent incorrigibility is constitutionally necessary. Pp. 5–14.

(2) Nor must a sentencer provide an on-the-record sentencing explanation with an "implicit finding" of permanent incorrigibility before sentencing a murderer under 18 to life without parole. An on-the-record sentencing explanation is not necessary to ensure that a sentencer considers a defendant's youth. Nor is an on-the-record sentencing explanation required by or consistent with *Miller* or *Montgomery*, neither of which said anything about a sentencing explanation. Pp. 14–19.

(3) The Court's decision does not disturb *Miller*'s holding (that a State may not impose a mandatory life-without-parole sentence on a murderer under 18) or *Montgomery*'s holding (that *Miller* applies retroactively on collateral review). The resentencing in Jones's case complied with *Miller* and *Montgomery* because the sentencer had discretion to impose a sentence less than life without parole in light of Jones's youth. The Court's decision today should not be construed as agreement or disagreement with Jones's sentence. In addition, the Court's decision does not preclude the States from imposing additional sentencing limits in cases involving murderers under 18. Nor does the Court's decision prohibit Jones from presenting his moral and policy arguments against his life-without-parole sentence to the state officials who are authorized to act on those arguments. Pp. 19–22.

285 So. 3d 626, affirmed.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., ALITO, GORSUCH, and BARRETT, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment. SOTOMAYOR, J., filed a dissenting opinion, in which BREYER and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 18–1259

BRETT JONES, PETITIONER *v.* MISSISSIPPI

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF MISSISSIPPI

[April 22, 2021]

JUSTICE KAVANAUGH delivered the opinion of the Court.

Under *Miller* v. *Alabama*, 567 U. S. 460 (2012), an individual who commits a homicide when he or she is under 18 may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencer therefore has discretion to impose a lesser punishment. In this case, a Mississippi trial judge acknowledged his sentencing discretion under *Miller* and then sentenced petitioner Brett Jones to life without parole for a murder that Jones committed when he was under 18. The Mississippi Court of Appeals affirmed, concluding that the discretionary sentencing procedure satisfied *Miller*.

Jones argues, however, that a sentencer's discretion to impose a sentence less than life without parole does not alone satisfy *Miller*. Jones contends that a sentencer who imposes a life-without-parole sentence must *also* make a separate factual finding that the defendant is permanently incorrigible, or at least provide an on-the-record sentencing explanation with an implicit finding that the defendant is permanently incorrigible. And Jones says that the trial judge did not make such a finding in his case.

Jones's argument that the sentencer must make a finding

of permanent incorrigibility is inconsistent with the Court's precedents. In *Miller*, the Court mandated "only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing" a life-without-parole sentence. *Id.,* at 483. And in *Montgomery* v. *Louisiana*, which held that *Miller* applies retroactively on collateral review, the Court flatly stated that "*Miller* did not impose a formal factfinding requirement" and added that "a finding of fact regarding a child's incorrigibility . . . is not required." 577 U. S. 190, 211 (2016). In light of that explicit language in the Court's prior decisions, we must reject Jones's argument. We affirm the judgment of the Mississippi Court of Appeals.

## I

## A

In August 2004, Brett Jones was living with his grandparents, Bertis and Madge, in Shannon, Mississippi. Shannon is a small town of about 2,000 in northern Mississippi near Tupelo, about halfway between Memphis and Birmingham off I–22.

At the time, Jones was only 15 years old. On the morning of August 9, 2004, Bertis discovered Jones's girlfriend, Michelle Austin, in Jones's bedroom. Bertis and Jones got into an argument, and Bertis ordered Austin out of the house. A few hours later, Jones told Austin that he "'was going to hurt'" his grandfather. 938 So. 2d 312, 314 (Miss. App. 2006).

That afternoon, Jones was in the kitchen making himself something to eat. Jones and Bertis began arguing again. The clash escalated from shouts to shoves to punches. Jones then stabbed his grandfather with a kitchen knife. When that knife broke, Jones picked up a second knife and continued stabbing Bertis. In total, Jones stabbed his grandfather eight times.

Bleeding profusely, Bertis staggered outside, fell to the

ground, and died. Jones did not call 911. Instead, he haphazardly attempted to cover up his role in the murder. He dragged Bertis's body back inside. Jones then washed the blood off his arms with a water hose, changed out of his bloody shirt, and moved Bertis's car over some blood stains on the carport floor.

While Jones was outside, he was seen by a neighbor. The neighbor called the police. Shortly thereafter, another neighbor saw Jones and Austin leaving the house together on foot. Later that night, police located Jones and Austin at a gas station several miles away. When questioned, Jones and Austin provided fake names to the officer. After a police pat down revealed a knife in Jones's pocket, the officer asked Jones whether it was the knife that he "'did it with.'" *Id.,* at 315. Jones responded, "'No, I already got rid of it.'" *Ibid.*

### B

Jones was charged with murder. The trial judge instructed the jury on murder and the lesser included offense of manslaughter. Jones claimed that he was not guilty because he acted in self-defense. The jury rejected that defense and found Jones guilty of murder.

Under Mississippi law at the time, murder carried a *mandatory* sentence of life without parole. Miss. Code Ann. §97–3–21 (2000), §47–7–3(g) (2004); see *Parker* v. *State,* 119 So. 3d 987, 996–997 (Miss. 2013). The trial judge therefore imposed that sentence. In 2006, the Mississippi Court of Appeals affirmed. See 938 So. 2d 312.

Jones later moved for post-conviction relief in state court, asserting among other things that his mandatory life-without-parole sentence violated the Cruel and Unusual Punishments Clause of the Eighth Amendment. The trial court denied the motion, and the Mississippi Court of Appeals affirmed. See 122 So. 3d 725 (2011).

In 2012, while the Mississippi Supreme Court was considering whether to review Jones's case, this Court decided *Miller* v. *Alabama*, 567 U. S. 460. *Miller* held that the Cruel and Unusual Punishments Clause of the Eighth Amendment prohibits *mandatory* life-without-parole sentences for murderers under 18, but the Court allowed *discretionary* life-without-parole sentences for those offenders.

In the wake of *Miller*, the Mississippi Supreme Court concluded that *Miller* applied retroactively on state collateral review. In Jones's case, the State Supreme Court ordered a new sentencing hearing where the sentencing judge could consider Jones's youth and exercise discretion in selecting an appropriate sentence. See 122 So. 3d 698 (2013).

At the resentencing, Jones's attorney argued that Jones's "chronological age and its hallmark features" diminished the "penological justifications for imposing the harshest sentences." App. 25, 27 (quoting *Miller*, 567 U. S., at 472, 477; emphasis deleted). Jones's attorney added that "nothing in this record . . . would support a finding that the offense reflects irreparable corruption." App. 143–144.

At the end of the hearing, the sentencing judge acknowledged that he had discretion under *Miller* to impose a sentence less than life without parole. But after considering the factors "relevant to the child's culpability," App. 149, the judge determined that life without parole remained the appropriate sentence for Jones, *id.,* at 152.

Jones appealed his sentence to the Mississippi Court of Appeals, citing both *Miller* and the then-recently decided case of *Montgomery* v. *Louisiana*, 577 U. S. 190 (2016), which in the interim had held that *Miller* applied retroactively on collateral review. According to Jones, in order to impose a life-without-parole sentence on a defendant who committed a murder when he or she was under 18, the sentencer must make a separate factual finding that the defendant is permanently incorrigible. The Mississippi Court of Appeals rejected Jones's argument, relying on this

Court's express statement in *Montgomery* that "'*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility.'" 285 So. 3d 626, 632 (2017) (quoting *Montgomery*, 577 U. S., at 211).

In light of disagreement in state and federal courts about how to interpret *Miller* and *Montgomery*, we granted certiorari. 589 U. S. \_\_\_ (2020). Compare, *e.g., Malvo* v. *Mathena*, 893 F. 3d 265 (CA4 2018), *Commonwealth* v. *Batts*, 640 Pa. 401, 163 A. 3d 410 (2017), and *Veal* v. *State*, 298 Ga. 691, 784 S. E. 2d 403 (2016), with, *e.g., United States* v. *Sparks*, 941 F. 3d 748 (CA5 2019), *People* v. *Skinner*, 502 Mich. 89, 917 N. W. 2d 292 (2018), and *State* v. *Ramos*, 187 Wash. 2d 420, 387 P. 3d 650 (2017).

## II

According to Jones, a sentencer's discretion to impose a sentence less than life without parole does not alone satisfy *Miller*. In Jones's view, a sentencer who imposes a life-without-parole sentence must *also* either (i) make a separate factual finding of permanent incorrigibility, or (ii) at least provide an on-the-record sentencing explanation with an "implicit finding" of permanent incorrigibility. Tr. of Oral Arg. 32; see *id.,* at 6, 14.

As we will explain, the Court has already ruled that a separate factual finding of permanent incorrigibility is not required. In *Montgomery*, the Court unequivocally stated that "*Miller* did not impose a formal factfinding requirement" and added that "a finding of fact regarding a child's incorrigibility . . . is not required." 577 U. S., at 211. In a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient.[1]

———————

[1] Both *Miller* and *Montgomery* generated vigorous dissents. The dissents in *Miller* stated that the Eighth Amendment does not prohibit mandatory life-without-parole sentences and asserted that the Court's

## A

In 2004, the year that Jones murdered his grandfather, about 16,000 individuals committed a homicide in the United States. See Dept. of Justice, Federal Bureau of Investigation, Crime in the United States 2004, Murder Offenders by Age, Sex, and Race 17 (Table 2.5). About 850 of the individuals who committed a homicide were known to be under 18—meaning that, on average, more than two homicides were committed every day by individuals under 18. *Ibid.*

The States authorize strict punishments for homicide, including for homicides committed by individuals under 18. But this Court has held that sentencing an offender who was under 18 at the time of the crime raises special constitutional considerations.

Ratified in 1791, the Eighth Amendment provides that "cruel and unusual punishments" shall not be "inflicted." Ratified in 1868, the Fourteenth Amendment incorporates the Cruel and Unusual Punishments Clause against the States.

In a series of Eighth Amendment cases applying the Cruel and Unusual Punishments Clause, this Court has stated that youth matters in sentencing. In *Roper* v. *Simmons*, 543 U. S. 551 (2005), the Court concluded that the Eighth Amendment prohibits capital punishment for murderers who were under 18 at the time of their crimes. And in *Graham* v. *Florida*, 560 U. S. 48 (2010), the Court held that the Eighth Amendment prohibits life without parole for offenders who were under 18 and committed *non-homicide* offenses. Importantly, however, *Graham* did not prohibit life without parole for offenders who were under 18

_____

decision contravened this Court's precedents. See 567 U. S., at 493–502 (ROBERTS, C. J., dissenting); *id.,* at 502–509 (THOMAS, J., dissenting); *id.,* at 509–515 (ALITO, J., dissenting). The lead dissent in *Montgomery* argued that *Miller* should not apply retroactively on collateral review. 577 U. S., at 224–227 (Scalia, J., dissenting).

and committed *homicide.* The *Graham* Court stated: "There is a line between homicide and other serious violent offenses against the individual." *Id.,* at 69 (internal quotation marks omitted).

And then in *Miller* in 2012, the Court allowed life-without-parole sentences for defendants who committed *homicide* when they were under 18, but only so long as the sentence is not mandatory—that is, only so long as the sentencer has discretion to "consider the mitigating qualities of youth" and impose a lesser punishment. 567 U. S., at 476 (internal quotation marks omitted). Four years later, *Montgomery* held that *Miller* applied retroactively to cases on collateral review. 577 U. S., at 206, 212.

Jones argues that *Miller* requires more than just a discretionary sentencing procedure. According to Jones, the sentencer must also make a separate factual finding of permanent incorrigibility before sentencing a murderer under 18 to life without parole.

The problem for Jones is that *Miller* and *Montgomery* squarely rejected such a requirement. *Miller* mandated "only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing" a life-without-parole sentence. 567 U. S., at 483. *Montgomery* then flatly stated that "*Miller* did not impose a formal factfinding requirement" and that "a finding of fact regarding a child's incorrigibility . . . is not required." 577 U. S., at 211.[2]

———————

[2] The key paragraph from *Montgomery* is as follows:

"Louisiana suggests that *Miller* cannot have made a constitutional distinction between children whose crimes reflect transient immaturity and those whose crimes reflect irreparable corruption because *Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility. That this finding is not required, however, speaks only to the degree of procedure *Miller* mandated in order to implement its substantive guarantee. When a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the

Notwithstanding that clear language in *Miller* and *Montgomery*, Jones advances three distinct arguments for why this Court should require a sentencer to make a finding of permanent incorrigibility before sentencing a murderer under 18 to life without parole.

*First,* Jones analogizes to cases where the Court has recognized certain eligibility criteria, such as sanity or a lack of intellectual disability, that must be met before an offender can be sentenced to death. See *Ford* v. *Wainwright*, 477 U. S. 399 (1986); *Atkins* v. *Virginia*, 536 U. S. 304 (2002). Jones argues that the Constitution similarly requires a sentencer to find permanent incorrigibility before sentencing a murderer under 18 to life without parole.

The State responds that permanent incorrigibility is not an eligibility criterion akin to sanity or a lack of intellectual disability. We agree with the State. For one thing, the Court has recognized that it "is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U. S., at 573. In addition, when the Court has established such an eligibility criterion, the Court has considered whether "'objective indicia of society's standards, as expressed in legislative enactments and state practice,'" demonstrated a "national consensus" in favor of the criterion. *Graham*, 560 U. S., at 61 (quoting

States' sovereign administration of their criminal justice systems. See *Ford* v. *Wainwright*, 477 U. S. 399, 416–417 (1986) ("[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences"). Fidelity to this important principle of federalism, however, should not be construed to demean the substantive character of the federal right at issue. That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." 577 U. S., at 211.

*Roper*, 543 U. S., at 563). But *Miller* did not identify a single State that, as of that time, made permanent incorrigibility an eligibility criterion for life-without-parole sentences imposed on murderers under 18.

Given those two points, it comes as no surprise that *Miller* declined to characterize permanent incorrigibility as such an eligibility criterion. Rather, *Miller* repeatedly described youth as a sentencing factor akin to a mitigating circumstance. And *Miller* in turn required a sentencing procedure similar to the procedure that this Court has required for the individualized consideration of mitigating circumstances in capital cases such as *Woodson* v. *North Carolina*, 428 U. S. 280, 303–305 (1976) (plurality opinion), *Lockett* v. *Ohio*, 438 U. S. 586, 597–609 (1978) (plurality opinion), and *Eddings* v. *Oklahoma*, 455 U. S. 104, 113–115 (1982). Those capital cases require sentencers to consider relevant mitigating circumstances when deciding whether to impose the death penalty. And those cases afford sentencers wide discretion in determining "the weight to be given relevant mitigating evidence." *Id.,* at 114–115. But those cases do not require the sentencer to make any particular factual finding regarding those mitigating circumstances.

Repeatedly citing *Woodson*, *Lockett*, and *Eddings*, the *Miller* Court stated that "a judge or jury must have the opportunity to consider" the defendant's youth and must have "discretion to impose a different punishment" than life without parole. 567 U. S., at 489; *id.,* at 465; see *id.,* at 470, 476, 483. Stated otherwise, the *Miller* Court mandated "only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing" a life-without-parole sentence. *Id.,* at 483. In that process, the sentencer will consider the murderer's "diminished culpability and heightened capacity for change." *Id.,* at 479. That sentencing procedure ensures that the sentencer affords individualized "consideration" to, among

other things, the defendant's "chronological age and its hallmark features." *Id.*, at 477.

To be sure, *Miller* also cited *Roper* and *Graham*. 567 U. S*.,* at 471–475. *Roper* barred capital punishment for offenders under 18. And *Graham* barred life without parole for offenders under 18 who committed non-homicide offenses. But *Miller* did not cite those cases to require a finding of permanent incorrigibility or to impose a categorical bar against life without parole for murderers under 18. We know that because *Miller* said so: "Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*." 567 U. S., at 483. Instead, *Miller* cited *Roper* and *Graham* for a simple proposition: Youth matters in sentencing. And because youth matters, *Miller* held that a sentencer must have discretion to consider youth before imposing a life-without-parole sentence, just as a capital sentencer must have discretion to consider other mitigating factors before imposing a death sentence.

In short, *Miller* followed the Court's many death penalty cases and required that a sentencer consider youth as a mitigating factor when deciding whether to impose a life-with-out-parole sentence. *Miller* did not require the sentencer to make a separate finding of permanent incorrigibility before imposing such a sentence. And *Montgomery* did not purport to add to *Miller*'s requirements.[3]

*Second*, Jones contends that the *Montgomery* Court must nonetheless have assumed that a separate factual finding

---

[3] If permanent incorrigibility were a factual prerequisite to a life-without-parole sentence, this Court's Sixth Amendment precedents might require that a jury, not a judge, make such a finding. See *Ring* v. *Arizona*, 536 U. S. 584 (2002); *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000). If we were to rule for Jones here, the next wave of litigation would likely concern the scope of the jury right. The fact that neither *Miller* nor *Montgomery* even mentioned the Sixth Amendment is further reason to doubt that those cases implicitly required a finding of permanent incorrigibility by the sentencer.

of permanent incorrigibility was necessary because *Montgomery* deemed *Miller* a substantive holding for purposes of applying *Miller* retroactively on collateral review. See *Teague* v. *Lane*, 489 U. S. 288, 310–311 (1989) (plurality opinion).

In advancing that argument, Jones relies on language in *Montgomery* that described *Miller* as permitting life-without-parole sentences only for "those whose crimes reflect permanent incorrigibility," rather than "transient immaturity." 577 U. S., at 209. In other words, because the *Montgomery* Court deemed *Miller* to be a substantive holding, and because *Montgomery* said that life without parole would be reserved for the permanently incorrigible, Jones argues that the *Montgomery* Court must have envisioned a separate factual finding of permanent incorrigibility, not just a discretionary sentencing procedure where youth would be considered.

That is an incorrect interpretation of *Miller* and *Montgomery*. We know as much because *Montgomery* said as much. To reiterate, the *Montgomery* Court explicitly stated that "a finding of fact regarding a child's incorrigibility . . . is not required." 577 U. S., at 211.

To break it down further: *Miller* required a discretionary sentencing procedure. The Court stated that a mandatory life-without-parole sentence for an offender under 18 "poses too great a risk of disproportionate punishment." 567 U. S., at 479. Despite the procedural function of *Miller*'s rule, *Montgomery* held that the *Miller* rule was substantive for retroactivity purposes and therefore applied retroactively on collateral review. 577 U. S., at 206, 212.[4] But in making

_____

[4] As the Court has stated in cases both before and after *Montgomery*, the Court determines whether a rule is substantive or procedural for retroactivity purposes "by considering the function of the rule" itself—not "by asking whether the constitutional right underlying the new rule is substantive or procedural." *Welch* v. *United States*, 578 U. S. 120, 130–131 (2016). For purposes of *Teague* v. *Lane*, 489 U. S. 288 (1989), a rule

the rule retroactive, the *Montgomery* Court unsurprisingly declined to impose new requirements not already imposed by *Miller*. As *Montgomery* itself explained, the Court granted certiorari in that case not to consider whether the rule announced in *Miller* should be expanded, but rather simply to decide whether *Miller*'s "holding is retroactive to juvenile offenders whose convictions and sentences were final when *Miller* was decided." 577 U. S., at 194. On the question of what *Miller* required, *Montgomery* was clear: "A hearing where youth and its attendant characteristics are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." *Id.,* at 210 (internal quotation marks omitted). But a separate finding of permanent incorrigibility "is not required." *Id.,* at 211.

The key assumption of both *Miller* and *Montgomery* was that discretionary sentencing allows the sentencer to consider the defendant's youth, and thereby helps ensure that life-without-parole sentences are imposed only in cases

————————

is procedural if it regulates "'only the manner of determining the defendant's culpability.'" *Welch*, 578 U. S., at 129 (quoting *Schriro* v. *Summerlin*, 542 U. S. 348, 353 (2004); emphasis deleted). A rule is substantive and applies retroactively on collateral review, by contrast, if it "'alters the range of conduct or the class of persons that the law punishes.'" *Welch*, 578 U. S., at 129 (quoting *Summerlin*, 542 U. S., at 353). As the Court's post-*Montgomery* decision in *Welch* already indicates, to the extent that *Montgomery*'s application of the *Teague* standard is in tension with the Court's retroactivity precedents that both pre-date and post-date *Montgomery*, those retroactivity precedents—and not *Montgomery*—must guide the determination of whether rules other than *Miller* are substantive. See *Welch*, 578 U. S. 120; *Summerlin*, 542 U. S. 348; *Lambrix* v. *Singletary*, 520 U. S. 518 (1997); *Saffle* v. *Parks*, 494 U. S. 484 (1990). To be clear, however, our decision today does not disturb *Montgomery*'s holding that *Miller* applies retroactively on collateral review. By now, most offenders who could seek collateral review as a result of *Montgomery* have done so and, if eligible, have received new discretionary sentences under *Miller*.

where that sentence is appropriate in light of the defendant's age. If the *Miller* or *Montgomery* Court wanted to require sentencers to also make a factual finding of permanent incorrigibility, the Court easily could have said so—and surely would have said so. But the Court did not say that, or anything like it. On the contrary, the *Montgomery* Court declared just the opposite: that the sentencer *need not* make such a separate factual finding of permanent incorrigibility.

In short, Jones's *Montgomery*-based argument for requiring a finding of permanent incorrigibility is unavailing because *Montgomery* explicitly stated that "*Miller* did not impose a formal factfinding requirement" and that "a finding of fact regarding a child's incorrigibility . . . is not required." *Montgomery*, 577 U. S., at 211.

*Third*, Jones relatedly argues that *Miller* and *Montgomery* sought to ensure that life without parole for murderers under 18 would be relatively rare. According to Jones, a separate factual finding of permanent incorrigibility is necessary to achieve that goal.

But in *Miller*, the Court stated that a discretionary sentencing procedure—where the sentencer can consider the defendant's youth and has discretion to impose a lesser sentence than life without parole—would itself help make life-without-parole sentences "relatively rar[e]" for murderers under 18. 567 U. S., at 484, n. 10.

Importantly, in concluding that a discretionary sentencing procedure would help make life-without-parole sentences relatively rare, the Court relied on data, not speculation. The Court pointed to statistics from 15 States that used discretionary sentencing regimes to show that, "when given the choice, sentencers impose life without parole on children relatively rarely." *Ibid.*[5] In light of those statistics, the Court reasoned that a discretionary sentencing

——————
[5] See Cal. Penal Code Ann. §190.5 (West 2014); Ga. Code Ann. §16–5–

procedure would make life-without-parole sentences relatively rare for juvenile offenders. But the Court did not suggest that the States with discretionary sentencing regimes also required a separate factual finding of permanent incorrigibility, or that such a finding was necessary to make life-without-parole sentences for juvenile offenders relatively rare. Therefore, to remain true to *Miller*'s reasoning, we cannot now require a separate factual finding of permanent incorrigibility. (Moreover, to reiterate, *Montgomery* explicitly stated that such a finding is *not* required.)

In sum, the Court has unequivocally stated that a separate factual finding of permanent incorrigibility is not required before a sentencer imposes a life-without-parole sentence on a murderer under 18. To borrow the apt words of the Michigan Supreme Court: "Given that *Montgomery* expressly held that '*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility,' we likewise hold that *Miller* does not require trial courts to make a finding of fact regarding a child's incorrigibility." *People* v. *Skinner*, 502 Mich. 89, 122, 917 N. W. 2d 292, 309 (2018) (citation omitted).

B

Even if a separate factual finding of permanent incorrigibility is not required, Jones alternatively contends that a sentencer must at least provide an on-the-record sentencing explanation with an "implicit finding" of permanent incorrigibility. Tr. of Oral Arg. 32; see *id.,* at 6, 14. Jones argues

─────────────

1 (2011), §17–10–31 (2013); Ind. Code §35–50–2–3 (2009); Me. Rev. Stat. Ann., Tit. 17–A, §1251 (2006); Md. Crim. Law Code Ann. §§2–201 to 2–203, 2–304 (2012); Nev. Rev. Stat. §200.030 (2012); N. M. Stat. Ann. §§31–18–13, 31–18–14, 31–18–15.2 (2010); N. D. Cent. Code Ann. §§12.1–32–01, 12.1–32–09.1 (2012); Okla. Stat., Tit. 21, §§13.1, 701.9 (2011); R. I. Gen. Laws §11–23–2 (2002); S. C. Code Ann. §16–3–20 (2015); Tenn. Code Ann. §§39–13–202, 39–13–204, 39–13–207 (2018); Utah Code §§76–3–206, 76–3–207 (2012); W. Va. Code Ann. §62–3–15 (Lexis 2014); Wis. Stat. §939.50 (2005), §973.014 (2007).

that such an explanation is necessary to ensure that the
sentencer actually considers the defendant's youth. And
Jones further asserts that the sentencing judge did not pro-
vide such an explanation at his resentencing.

We reject Jones's alternative argument because an on-
the-record sentencing explanation with an implicit finding
of permanent incorrigibility (i) is not necessary to ensure
that a sentencer considers a defendant's youth, (ii) is not
required by or consistent with *Miller*, (iii) is not required by
or consistent with this Court's analogous death penalty
precedents, and (iv) is not dictated by any consistent histor-
ical or contemporary sentencing practice in the States.

*First*, and most fundamentally, an on-the-record sentenc-
ing explanation is not necessary to ensure that a sentencer
considers a defendant's youth. Jones's argument to the con-
trary rests on the assumption that meaningful daylight ex-
ists between (i) a sentencer's discretion to consider youth,
and (ii) the sentencer's actual consideration of youth. But
if the sentencer has discretion to consider the defendant's
youth, the sentencer necessarily *will* consider the defend-
ant's youth, especially if defense counsel advances an argu-
ment based on the defendant's youth. Faced with a con-
victed murderer who was under 18 at the time of the offense
and with defense arguments focused on the defendant's
youth, it would be all but impossible for a sentencer to avoid
considering that mitigating factor.[6]

––––––––––

[6] If defense counsel fails to make the sentencer aware of the defend-
ant's youth, it is theoretically conceivable (albeit still exceedingly un-
likely in the real world) that the sentencer might somehow not be aware
of the defendant's youth. But in that highly unlikely scenario, the de-
fendant may have a potential ineffective-assistance-of-counsel claim, not
a *Miller* claim—just as defense counsel's failure to raise relevant miti-
gating circumstances in a death penalty sentencing proceeding can con-
stitute a potential ineffective-assistance-of-counsel problem, not a *Wood-
son/Lockett/Eddings* violation. Cf. *Wiggins* v. *Smith*, 539 U. S. 510,
533–538 (2003) (counsel in capital case was ineffective for failing to in-
vestigate and present mitigating evidence at sentencing); *Williams* v.

It is true that one sentencer may weigh the defendant's youth differently than another sentencer or an appellate court would, given the mix of all the facts and circumstances in a specific case. Some sentencers may decide that a defendant's youth supports a sentence less than life without parole. Other sentencers presented with the same facts might decide that life without parole remains appropriate despite the defendant's youth. But the key point remains that, in a case involving a murderer under 18, a sentencer cannot avoid considering the defendant's youth if the sentencer has discretion to consider that mitigating factor.[7]

*Second*, turning to precedent, an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility is not required by or consistent with *Miller*. The Court's thorough opinion in *Miller* did not even hint at requiring an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility. *Miller* highlighted 15 existing discretionary state sentencing systems as examples of what was missing in the mandatory Alabama regime before the Court in that case. 567 U. S., at 484, n. 10. As the Court explained, those discretionary sentencing regimes ensured individualized consideration of youth.

––––––––––

*Taylor*, 529 U. S. 362, 395–398 (2000) (same).

[7] This Court's death penalty cases recognize a potential Eighth Amendment claim if the sentencer expressly refuses *as a matter of law* to consider relevant mitigating circumstances. See *Eddings* v. *Oklahoma*, 455 U. S. 104, 114–115 (1982). By analogy here, if a sentencer considering life without parole for a murderer who was under 18 expressly refuses as a matter of law to consider the defendant's youth (as opposed to, for example, deeming the defendant's youth to be outweighed by other factors or deeming the defendant's youth to be an insufficient reason to support a lesser sentence under the facts of the case), then the defendant might be able to raise an Eighth Amendment claim under the Court's precedents. In any event, we need not explore that possibility because the record here does not reflect that the sentencing judge refused as a matter of law to consider Jones's youth.

But the Court did not suggest that those discretionary sentencing regimes required some kind of sentencing explanation. Again, if the *Miller* Court believed that a sentencing explanation with an implicit finding of permanent incorrigibility was constitutionally necessary, the Court easily could have and surely would have said so. But *Miller* did not say a word about requiring some kind of particular sentencing explanation with an implicit finding of permanent incorrigibility, as *Montgomery* later confirmed.

*Third*, and just as telling, an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility is not required by or consistent with this Court's death penalty cases. Those cases demonstrate that an on-the-record sentencing explanation is not necessary to ensure that the sentencer considers relevant mitigating circumstances.

In a series of capital cases over the past 45 years, the Court has required the sentencer to consider mitigating circumstances when deciding whether to impose the death penalty. See *Woodson*, 428 U. S., at 303–305 (plurality opinion); *Lockett*, 438 U. S., at 597–609 (plurality opinion); *Eddings*, 455 U. S., at 113–115; see also *Tennard* v. *Dretke*, 542 U. S. 274, 285 (2004); *Penry* v. *Lynaugh*, 492 U. S. 302, 318–319 (1989).

But the Court has *never* required an on-the-record sentencing explanation or an implicit finding regarding those mitigating circumstances. The reason is evident: Under the discretionary death penalty sentencing procedure required by cases such as *Woodson*, *Lockett*, and *Eddings*, the sentencer will necessarily consider relevant mitigating circumstances. A sentencing explanation is not necessary to ensure that the sentencer in death penalty cases considers the relevant mitigating circumstances. It follows that a sentencing explanation is likewise not necessary to ensure that the sentencer in juvenile life-without-parole cases considers the defendant's youth.

Because the Constitution does not require an on-the-record explanation of mitigating circumstances by the sentencer in *death penalty cases*, it would be incongruous to require an on-the-record explanation of the mitigating circumstance of youth by the sentencer in *life-without-parole cases*. Jones offers no persuasive answer for that incongruity in his argument.

*Fourth*, an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility is not dictated by any historical or contemporary sentencing practice in the States. To be sure, when a state judge imposes a sentence of imprisonment, particularly a lengthy sentence, the judge often will explain both the sentence and the judge's evaluation of any mitigating circumstances. But many States traditionally have not legally required (and some States still do not legally require) on-the-record explanations by the sentencer. See, *e.g.,* A. Campbell, Law of Sentencing §10:5, pp. 473–480 (3d ed. 2004) (hereinafter Campbell). Indeed, in some States, the jury is the sentencer for certain kinds of crimes, and juries typically do not supply sentencing explanations. See generally King & Noble, Felony Jury Sentencing in Practice: A Three-State Study, 57 Vand. L. Rev. 885 (2004). Even when state law requires a sentencer to supply reasons, many States do not impose a formulaic checklist of topics or a magic-words requirement with respect to particular mitigating circumstances. And appellate courts do not necessarily reverse merely because the sentencer could have said more about mitigating circumstances. See Campbell 477; 22A Cal. Jur. 3d, Crim. Law: Posttrial Proceedings §408, p. 234 (2017) ("[U]nless the record affirmatively reflects otherwise, the trial court will be deemed to have considered the relevant criteria, such as mitigating circumstances, enumerated in the sentencing rules").

Those state practices matter here because, as the Court explained in *Montgomery*, when "a new substantive rule of constitutional law is established, this Court is careful to

limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." 577 U. S., at 211. So it is here. Because *Montgomery* directs us to "avoid intruding more than necessary" upon the States, *ibid.*, and because a discretionary sentencing procedure suffices to ensure individualized consideration of a defendant's youth, we should not now add still more procedural requirements.

In sum, Jones's alternative argument fails. The Court's precedents do not require an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility.

## III

The Court's decision today carefully follows both *Miller* and *Montgomery*. The dissent nonetheless claims that we are somehow implicitly overruling those decisions. We respectfully but firmly disagree: Today's decision does not overrule *Miller* or *Montgomery*. *Miller* held that a State may not impose a mandatory life-without-parole sentence on a murderer under 18. Today's decision does not disturb that holding. *Montgomery* later held that *Miller* applies retroactively on collateral review. Today's decision likewise does not disturb that holding.

We simply have a good-faith disagreement with the dissent over how to interpret *Miller* and *Montgomery*. That kind of debate over how to interpret relevant precedents is commonplace. Here, the dissent thinks that we are unduly narrowing *Miller* and *Montgomery*. And we, by contrast, think that the dissent would unduly broaden those decisions. The dissent draws inferences about what, in the dissent's view, *Miller* and *Montgomery* "must have done" in order for the decisions to "make any sense." *Post*, at 12 (opinion of SOTOMAYOR, J.). We instead rely on what *Miller*

and *Montgomery* said—that is, their explicit language addressing the precise question before us and definitively rejecting any requirement of a finding of permanent incorrigibility.

Notwithstanding our disagreement about whether *Miller* and *Montgomery* require a finding of permanent incorrigibility, we and the dissent both recognize that *Miller* and *Montgomery* have been consequential. *Miller*'s discretionary sentencing procedure has resulted in numerous sentences less than life without parole for defendants who otherwise would have received mandatory life-without-parole sentences. For example, in *Miller* resentencings in Mississippi where Jones was convicted and sentenced, *Miller* has reduced life-without-parole sentences for murderers under 18 by about 75 percent. See The Campaign for the Fair Sentencing of Youth, Tipping Point: A Majority of States Abandon Life-Without-Parole Sentences for Children 7 (2018). Those statistics bear out *Miller*'s prediction: A discretionary sentencing procedure has indeed helped make life-without-parole sentences for offenders under 18 "relatively rar[e]." 567 U. S., at 484, n. 10.

Moreover, as a result of *Montgomery*, many homicide offenders under 18 who received life-without-parole sentences that were final before *Miller* have now obtained new sentencing proceedings and have been sentenced to less than life without parole.

Despite the significant changes wrought by *Miller* and *Montgomery*, the dissent now wants more—an additional constitutional requirement that the sentencer must make a finding of permanent incorrigibility before sentencing a murderer under 18 to life without parole. But to reiterate, in *Miller* and *Montgomery*, the Court unequivocally stated that such a finding is not required. And we will not now rewrite those decisions to impose a requirement that the Court twice rejected.

To be clear, our ruling on the legal issue presented here

should not be construed as agreement or disagreement with the sentence imposed against Jones. As this case again demonstrates, any homicide, and particularly a homicide committed by an individual under 18, is a horrific tragedy for all involved and for all affected. Determining the proper sentence in such a case raises profound questions of morality and social policy. The States, not the federal courts, make those broad moral and policy judgments in the first instance when enacting their sentencing laws. And state sentencing judges and juries then determine the proper sentence in individual cases in light of the facts and circumstances of the offense, and the background of the offender.

Under our precedents, this Court's more limited role is to safeguard the limits imposed by the Cruel and Unusual Punishments Clause of the Eighth Amendment. The Court's precedents require a discretionary sentencing procedure in a case of this kind. The resentencing in Jones's case complied with those precedents because the sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of Jones's youth. Moreover, this case does not properly present—and thus we do not consider—any as-applied Eighth Amendment claim of disproportionality regarding Jones's sentence. See Brief for United States as *Amicus Curiae* 23; *Harmelin* v. *Michigan*, 501 U. S. 957, 996–1009 (1991) (Kennedy, J., concurring in part and concurring in judgment).

Importantly, like *Miller* and *Montgomery*, our holding today does not preclude the States from imposing additional sentencing limits in cases involving defendants under 18 convicted of murder. States may categorically prohibit life without parole for all offenders under 18. Or States may require sentencers to make extra factual findings before sentencing an offender under 18 to life without parole. Or States may direct sentencers to formally explain on the record why a life-without-parole sentence is appropriate not-

withstanding the defendant's youth. States may also establish rigorous proportionality or other substantive appellate review of life-without-parole sentences. All of those options, and others, remain available to the States. See generally J. Sutton, 51 Imperfect Solutions (2018). Indeed, many States have recently adopted one or more of those reforms. See, *e.g.,* Brief for Former West Virginia Delegate John Ellem et al. as *Amici Curiae* in *Mathena* v. *Malvo*, O. T. 2019, No. 18–217, pp. 29–36. But the U. S. Constitution, as this Court's precedents have interpreted it, does not demand those particular policy approaches.

Finally, our holding today is far from the last word on whether Jones will receive relief from his sentence. Jones contends that he has maintained a good record in prison and that he is a different person now than he was when he killed his grandfather. He articulates several moral and policy arguments for why he should not be forced to spend the rest of his life in prison. Our decision allows Jones to present those arguments to the state officials authorized to act on them, such as the state legislature, state courts, or Governor. Those state avenues for sentencing relief remain open to Jones, and they will remain open to him for years to come.

*        *        *

We affirm the judgment of the Mississippi Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

───────────

No. 18–1259

───────────

## BRETT JONES, PETITIONER *v.* MISSISSIPPI

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
MISSISSIPPI

[April 22, 2021]

JUSTICE THOMAS, concurring in the judgment.

The Court correctly holds that the Eighth Amendment
does not require a finding that a minor be permanently in-
corrigible as a prerequisite to a sentence of life without pa-
role. But in reaching that result, the majority adopts a
strained reading of *Montgomery* v. *Louisiana*, 577 U. S. 190
(2016), instead of outright admitting that it is irreconcilable
with *Miller* v. *Alabama*, 567 U. S. 460 (2012)—and the Con-
stitution. The better approach is to be patently clear that
*Montgomery* was a "demonstrably erroneous" decision wor-
thy of outright rejection. *Gamble* v. *United States*, 587 U. S.
\_\_\_, \_\_\_ (2019) (THOMAS, J., concurring) (slip op., at 2).

I

Brett Jones, then 15, murdered his grandfather. At the
time of his trial and sentencing, Mississippi law automati-
cally punished his crime with life without parole. A few
years later, however, this Court held that youthful offend-
ers are constitutionally entitled to an "individualized sen-
tencing" process. *Miller*, 567 U. S., at 465. The Mississippi
Supreme Court thus ordered a new hearing at which the
judge dutifully considered the factors "relevant to [Jones']
culpability" before again sentencing him to life without pa-
role. App. 149.

Jones appealed, citing yet another new decision—*Mont-
gomery*—in which this Court held that *Miller*'s rule was

"substantive" and hence had to be retroactively applied to cases on collateral review. 577 U. S., at 212. Without more, the fact that *Miller* was now retroactive did not help Jones, as he had already received the "individualized" hearing *Miller* required. 567 U. S., at 465. Therefore, Jones argued that *Montgomery* further required the sentencing judge to "make a specific 'finding' that he is irretrievably depraved, irreparably corrupt, or permanently incorrigible." 285 So. 3d 626, 632 (Miss. App. 2017). That theory was not necessarily a stretch—as *Montgomery* explained that a life-without-parole sentence "violates the Eighth Amendment for a child whose crime reflects '"unfortunate yet transient immaturity."'" 577 U. S., at 208. But the Mississippi Court of Appeals disagreed, noting that *Montgomery* also "stated that '*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility' [or] 'impose a formal factfinding requirement.'" 285 So. 3d, at 632.

## II

*Miller* and *Montgomery* are from the same lineage of precedent that refashions the Eighth Amendment to accommodate this Court's views of juvenile justice.[1] The similarities end there, however, because the decisions cannot be reconciled.

## A

*Miller* announced a purely procedural rule: A State may not automatically sentence a juvenile to life without parole, but must instead provide an individualized sentencing process. In reaching this conclusion, the Court explicitly cab-

---

[1] See, *e.g., Roper* v. *Simmons*, 543 U. S. 551, 556, 578 (2005) (prohibiting the execution of a (barely) juvenile murderer who had bragged that his age would allow him to "'get away with it'"); *Graham* v. *Florida*, 560 U. S. 48, 74 (2010) (prohibiting life-without-parole sentences for juvenile nonhomicide offenders).

ined its holding to cases in which the sentencer lacked "discretion to impose a different punishment." *Miller*, 567 U. S., at 465; accord, *e.g., id.,* at 479–480. Were there any doubt that *Miller* focused only on the availability of individualized sentencing, the Court stressed that it was "not categorically bar[ring] a penalty for a class of offenders or type of crime" but instead "mandat[ing] only that a sentencer follow a certain process." *Id.*, at 483.

*Miller*'s descriptions of its procedural holding track with the opinion's mode of analysis. At one point, for example, *Miller* discussed a line of precedents that condition the death penalty on an individualized sentencing process. *Id.,* at 475–476. Reasoning by analogy, the Court explained that "mandatory penalties" for juveniles "preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id.*, at 476. The Court also canvassed the jurisdictions that had some form of mandatory life-without-parole, *id.*, at 482–487, and nn. 9–10, 13–14, which would have been an unusual detour if the opinion were concerned with anything more than nondiscretionary punishments. And it declined to "consider [the] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles." *Id.,* at 479.

B

This narrow holding became inconvenient when the Court decided to apply *Miller* retroactively to prisoners whose sentences were already final. Under the approach announced in *Teague* v. *Lane*, 489 U. S. 288 (1989), *Miller* could have been retroactive only if it were a "watershed" rule of criminal procedure or a "substantive" rule, *Beard* v. *Banks*, 542 U. S. 406, 416–419, and n. 7 (2004).

Precedent foreclosed the first option. *Miller* "mandate[d] only that a sentencer follow a certain process" as a prereq-

uisite to life without parole, 567 U. S., at 483, but this directive was hardly "watershed." According to *Teague*, a procedural rule might have a claim to watershed status if it were "'"implicit in the concept of ordered liberty."'" *Banks*, 542, U. S., at 417. So limited was this possibility that, in "'the years since *Teague*, we . . . rejected every claim that a new rule satisfied the requirements for watershed status.'" *Ramos* v. *Louisiana*, 590 U. S. ___, ___ (2020) (KAVANAUGH, J., concurring in part) (slip op., at 16). Or in more concrete terms, we repeatedly suggested that a rule might be watershed only if it were akin to a defendant's right to counsel as articulated in *Gideon* v. *Wainwright*, 372 U. S. 335 (1963). See *Banks*, 542 U. S., at 417–418. Whatever *Miller* might have done, its narrow rule about juvenile sentencing "'ha[d] none of the primacy and centrality of the rule adopted in *Gideon*.'" *Banks*, 542 U. S., at 420.

Rather than accept what was plainly the case—that *Miller* was procedural, not watershed, and thus not retroactive—*Montgomery* proceeded to "rewrite" it into a substantive rule. 577 U. S., at 224 (Scalia, J., dissenting). Despite acknowledging that "*Miller*'s holding has a procedural component," the majority explained that this procedure was *actually* just a way "to implement a substantive guarantee." *Id.*, at 209–210. This guarantee, according to *Montgomery*, was that "all" juvenile offenders—except for a rare few "whose crimes reflect permanent incorrigibility"—are categorically exempt from life without parole. *Id.*, at 209.

That reimagined rule was substantive under our precedents. Substantive rules include those that "'prohibi[t] a certain category of punishment for a class of defendants because of their status or offense.'" *Banks*, 542 U. S., at 416. For example—a rule that "life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Montgomery*, 577 U. S., at 210. *Montgomery* could not have been clearer that its rule transcended mere procedure: "Even if a court considers a child's age before

sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects '"unfortunate yet transient immaturity."'" *Id.,* at 208.

The problem with this new rule is that it had little to do with *Miller*. Through a feat of legerdemain, *Montgomery* began by acknowledging that *Miller* did "'not categorically bar a penalty for a class of offenders or type of crime,'" yet just three sentences later concluded that "*Miller* did bar life without parole . . . for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." 577 U. S., at 209. In a similar Janus-faced demonstration, *Montgomery* reiterated *Miller*'s assurance that "trial courts [need not] make a finding of fact regarding a child's incorrigibility," yet decided that "*Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." 577 U. S., at 209–211.[2] These statements cannot be reconciled.

## C

Just as the procedural rule of *Miller* created problems for the majority in *Montgomery*, the substantive rule of *Montgomery* creates problems for the majority in this case. If

------

[2] The Court's language in this line of precedents is notable. When addressing juvenile murderers, this Court has stated that "'*children* are different'" and that courts must consider "a *child*'s lesser culpability." *Montgomery*, 577 U. S., at 207–208 (emphasis added). And yet, when assessing the Court-created right of an individual of the same age to seek an abortion, Members of this Court take pains to emphasize a "young *woman*'s" right to choose. See, *e.g.*, *Lambert* v. *Wicklund*, 520 U. S. 292, 301 (1997) (Stevens, J., joined by Ginsburg and BREYER, JJ., concurring in judgment) (emphasis added); *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 899 (1992) (joint opinion of O'Connor, Kennedy, and Souter, JJ.); *Ohio* v. *Akron Center for Reproductive Health*, 497 U. S. 502, 532 (1990) (Blackmun, J., joined by Brennan and Marshall, JJ., dissenting). It is curious how the Court's view of the maturity of minors ebbs and flows depending on the issue.

*Montgomery* is correct about the existence of a concrete class of offenders who—as a matter of fundamental constitutional law—are categorically exempt from a sentence of life without parole, then there must be a determination as to whether Jones falls within that protected class. Otherwise, the "line" *Miller* ostensibly "drew . . . between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption" is more fanciful than real. *Montgomery*, 577 U. S., at 209.

Sure enough, this Court has often demanded factual findings when it comes to other classes of criminals that this Court has declared categorically exempt from certain punishments. See, *e.g., Moore* v. *Texas*, 586 U. S. ___, ___ (2019) (*per curiam*) (slip op., at 10) (finding that an offender "ha[d] shown [that] he is a person with intellectual disability"); *Madison* v. *Alabama*, 586 U. S. ___, ___, ___–___ (2019) (slip op., at 8, 17–18) (vacating and remanding "for renewed consideration" of the record after a state court "found [a prisoner] mentally competent" and thus eligible for execution). I doubt that a majority of this Court would tolerate the execution of an offender who alleges insanity or intellectual disability absent a satisfactory finding to the contrary.

In response, the majority suggests that insanity and intellectual disability are legitimate "eligibility criteri[a]" because they are easy to evaluate, whereas "permanent incorrigibility . . . 'is difficult even for expert psychologists to [assess].'" *Ante*, at 8. This notion that the former categories are clear cut and predictable might come as news to the States that have spent years chasing the ever-evolving definitions of mental incompetence promulgated by this Court and its preferred experts. See, *e.g.*, *Moore*, 586 U. S., at ___–___ (slip op., at 2–10); *Moore* v. *Texas*, 581 U. S. ___, ___, ___–___ (2017) (slip op., at 2, 5–18) (courts must heed "the force of the medical community's consensus"); *Hall* v. *Florida*, 572 U. S. 701, 724 (2014). I trust, however, that future decisions will contain simple and static rules.

### D

*Montgomery*'s creation of a categorical exemption for certain offenders thus leaves us with two obvious options. First, we could follow *Montgomery*'s logic and hold that the "legality" of Jones' sentence turns on whether his crime in fact "reflect[s] permanent incorrigibility." 577 U. S., at 205, 209. Or we could just acknowledge that *Montgomery* had no basis in law or the Constitution.

The majority, however, selects a third way: Overrule *Montgomery* in substance but not in name. The opinion candidly admits both that *Miller*'s rule was "procedural" and that *Montgomery* "ma[de] the rule retroactive." *Ante,* at 9, 11–12. The only way to reconcile these statements with the bottom-line judgment in this case—that Jones is not entitled to a determination whether he falls within a constitutionally protected category of offenders—is to reject *Montgomery*. And sure enough, the majority does just that, albeit in a footnote. See *ante*, at 12, n. 4 (explaining that *Montgomery* is "in tension" with many other decisions). But because *Montgomery*'s freewheeling approach to the law is ripe for abuse, the majority's whisper is worth restating above the line: *Montgomery* gave a good-for-one-ride ticket to a class of juvenile offenders, and its errors will never be repeated.

Firm condemnation of *Montgomery* is particularly appropriate because this Court is unable to fully repair the damage it has caused. Although the majority closes the door to courts following *Montgomery* in the future, in doing so it tacitly admits that the horses have already left the barn: "[M]ost offenders who could seek collateral review as a result of *Montgomery* have done so." *Ante*, at 12, n. 4. Today's judgment thus offers cold comfort to the States that have already faced the unenviable choice between "permitting juvenile homicide offenders to be considered for parole" and relitigating murder sentences long after the fact. *Montgomery*, 577 U. S., at 212; see also *id.*, at 226–227 (Scalia, J.,

dissenting). The least we can do is to fully own up to *Mont-gomery*'s sins.

The majority also largely leaves untouched *Montgomery*'s violation of the rule that the Constitution "'leaves the unavoidably moral question of who "deserves" a particular nonprohibited method of punishment to the judgment of the legislatures that authorize the penalty.'" *Miller*, 567 U. S., at 504 (THOMAS, J., dissenting). When the Eighth Amendment was enacted, juveniles even younger than Jones could be tried as adults, and mandatory death sentences were available. See *id.*, at 503, n. 2. "It is therefore implausible that a [15]-year-old's . . . prison sentence—of any length, with or without parole—would have been viewed as cruel and unusual." *Ibid.* By failing to condemn *Montgomery*'s expansion of *Miller* to an entire category of individuals, the majority blesses yet another step "on the path to further judicial displacement of the legislative role in prescribing appropriate punishment for crime." 567 U. S., at 500 (ROBERTS, C. J., dissenting).

Finally, I would expressly reject the portion of *Montgomery* that "purported to constitutionalize" the substantive exception "so that it would apply in [the petitioner's] state court proceeding." Brief for Jonathan F. Mitchell et al. as *Amici Curiae* in *Edwards* v. *Vannoy*, O. T. 2020, No. 19–5807, pp. 5–6 (emphasis deleted). Despite this Court's longstanding recognition that "the Constitution neither prohibits nor requires retrospective effect," *Linkletter* v. *Walker*, 381 U. S. 618, 629 (1965); cf. *Teague*, 489 U. S., at 302–310 (plurality opinion) (narrowing *Linkletter* even further), the *Montgomery* Court demanded that the Louisiana courts "recognize [*Miller*'s] retroactive effect." 577 U. S., at 200, 205. That improper intrusion on state postconviction review is also worth correcting.

*          *          *

Today's majority labors mightily to avoid confronting the

tension between *Miller* and *Montgomery*.  But though the Court purports to leave *Montgomery*'s holding intact, it recognizes that *Montgomery*'s analysis is untenable and not to be repeated.  It would be simpler to reject *Montgomery* in both name and substance.

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–1259

_____

## BRETT JONES, PETITIONER *v.* MISSISSIPPI

### ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF MISSISSIPPI

[April 22, 2021]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER and JUSTICE KAGAN join, dissenting.

Today, the Court guts *Miller* v. *Alabama*, 567 U. S. 460 (2012), and *Montgomery* v. *Louisiana*, 577 U. S. 190 (2016). Contrary to explicit holdings in both decisions, the majority claims that the Eighth Amendment permits juvenile offenders convicted of homicide to be sentenced to life without parole (LWOP) as long as "the sentence is not mandatory and the sentencer therefore has discretion to impose a lesser punishment." *Ante,* at 1. In the Court's view, a sentencer never need determine, even implicitly, whether a juvenile convicted of homicide is one of "those rare children whose crimes reflect irreparable corruption." *Montgomery*, 577 U. S., at 209. Even if the juvenile's crime reflects "'unfortunate yet transient immaturity,'" *Miller*, 567 U. S., at 479, he can be sentenced to die in prison.

This conclusion would come as a shock to the Courts in *Miller* and *Montgomery*. *Miller*'s essential holding is that "a lifetime in prison is a disproportionate sentence for all but the rarest children, those whose crimes reflect 'irreparable corruption.'" *Montgomery*, 577 U. S., at 195 (quoting *Miller*, 567 U. S., at 479–480). Sentencing discretion is "necessary to separate those juveniles who may be sentenced to life without parole from those who may not," *Montgomery*, 577 U. S., at 210, but it is far from sufficient. A sentencer must actually "make th[e] judgment" that the

juvenile in question is one of those rare children for whom
LWOP is a constitutionally permissible sentence. *Miller*,
567 U. S., at 480. The Court has thus expressly rejected the
notion that sentencing discretion, alone, suffices: "Even if a
court considers a child's age before sentencing him or her to
a lifetime in prison, that sentence still violates the Eighth
Amendment for a child whose crime reflects unfortunate
yet transient immaturity." *Montgomery*, 577 U. S., at 208
(internal quotation marks omitted).

Today, however, the Court reduces *Miller* to a decision
requiring "just a discretionary sentencing procedure where
youth [is] considered." *Ante,* at 11. Such an abrupt break
from precedent demands "special justification." *Ramos* v.
*Louisiana*, 590 U. S. ___, ___ (2020) (KAVANAUGH, J., con-
curring in part) (slip op., at 6) (internal quotation marks
omitted). The Court offers none. Instead, the Court at-
tempts to circumvent *stare decisis* principles by claiming
that "[t]he Court's decision today carefully follows both *Mil-
ler* and *Montgomery*." *Ante,* at 19. The Court is fooling no
one. Because I cannot countenance the Court's abandon-
ment of *Miller* and *Montgomery*, I dissent.

I

Time and again, this Court has recognized that "children
are constitutionally different from adults for purposes of
sentencing." *Miller*, 567 U. S., at 471. In *Roper* v. *Sim-
mons*, 543 U. S. 551 (2005), the Court held that the Eighth
Amendment forbids sentencing children to death because
"[c]apital punishment must be limited to those offenders . . .
whose extreme culpability makes them the most deserving
of execution." *Id.,* at 568 (internal quotation marks omit-
ted). Juvenile offenders "cannot with reliability be classi-
fied among the worst offenders" for several reasons. *Id.,* at
569. First, "as any parent knows," and as scientific and so-
ciological studies have confirmed, juveniles are less mature

and responsible than adults, which "often result[s] in impetuous and ill-considered actions and decisions." *Ibid.* (internal quotation marks omitted). Second, juveniles are "more vulnerable or susceptible to negative influences and outside pressures" and "have less control . . . over their own environment." *Ibid.* Finally, "the character of a juvenile" is "more transitory" than that of an adult. *Id.,* at 570. "[A]s individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Ibid.* (internal quotation marks omitted). Weighed against these "signature qualities of youth," the penological justifications for the death penalty collapse. *Id.,* at 570–571 (internal quotation marks omitted).

Next, in *Graham* v. *Florida*, 560 U. S. 48 (2010), this Court held that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Id.,* at 82. "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible." *Id.,* at 72. But "incorrigibility is inconsistent with youth." *Id.,* at 73 (internal quotation marks omitted). Rather, "[m]aturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation." *Id.,* at 79. *Graham* therefore insisted that sentencers not deprive juvenile nonhomicide offenders "of the opportunity to achieve maturity . . . and self-recognition of human worth and potential" by sentencing them to die in prison. *Ibid.*

In *Miller*, this Court extended *Graham*'s logic to juveniles convicted of homicide. *Miller* recognized that "none of what [*Graham*] said about children . . . is crime-specific." 567 U. S., at 473. Thus, taking *Graham* as its "foundation stone," *Miller* reiterated that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." 567 U. S., at 470–471, n. 4,

472. *Miller* emphasized that LWOP is an "'especially harsh punishment for a juvenile.'" *Id.,* at 475 (quoting *Graham*, 560 U. S., at 70). "Imprisoning an offender until he dies alters the remainder of his life 'by a forfeiture that is irrevocable.'" 567 U. S., at 474–475 (quoting *Graham*, 560 U. S., at 69). It is the "denial of hope" itself. *Id.,* at 70 (internal quotation marks omitted).

*Miller* stopped short of prohibiting LWOP for all juveniles convicted of homicide. Instead, it required sentencers to distinguish "between the juvenile offender whose crime reflects unfortunate and transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." 567 U. S., at 479–480 (internal quotation marks omitted). Only those rare few in the latter category are constitutionally eligible for LWOP under *Miller*. As such, before imposing a sentence of LWOP, a sentencer must actually "make that judgment," and make it correctly. *Id.,* at 480; see *Adams* v. *Alabama*, 578 U. S. 994, 999 (2016) (SOTOMAYOR, J., concurring in decision to grant, vacate, and remand).

Finally, in *Montgomery*, this Court confirmed the substantive nature of *Miller*'s prohibition on LWOP for most juveniles. *Montgomery* held that *Miller* applies retroactively in cases on collateral review because it "rendered life without parole an unconstitutional penalty for . . . juvenile offenders whose crimes reflect the transient immaturity of youth." 577 U. S., at 208. Under the retroactivity doctrine in *Teague* v. *Lane*, 489 U. S. 288 (1989), a new constitutional rule is considered "substantive," and thus retroactive, if it "alters the range of conduct or the class of persons that the law punishes." *Montgomery*, 577 U. S., at 206 (internal quotation marks omitted); see *Teague*, 489 U. S., at 311 (plurality opinion). A procedural rule, on the other hand, "regulate[s] only the manner of determining the defendant's culpability." *Montgomery*, 577 U. S., at 206 (emphasis deleted; internal quotation marks omitted). Such

rules generally have not applied retroactively. *Id.,* at 198.

*Montgomery* recognized that *Miller* "has a procedural component," in that "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." 577 U. S., at 209–210 (quoting *Miller*, 567 U. S., at 465). The Court made clear, however, that "[t]he hearing does not replace . . . *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." 577 U. S., at 210. Rather, the hearing "gives effect" to *Miller*'s prohibition on LWOP by "enabl[ing] a prisoner to show that he falls within the category of persons whom the law may no longer punish [with LWOP]." 577 U. S., at 210. Thus, under *Miller*, juvenile offenders "must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored." 577 U. S., at 213.

## II
## A

Today, the Court distorts *Miller* and *Montgomery* beyond recognition. According to the majority, "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient" for a State to sentence a juvenile convicted of homicide to LWOP. *Ante,* at 5. "[S]o long as the sentencer has discretion to 'consider the mitigating qualities of youth' and impose a lesser punishment," any juvenile convicted of homicide may be sentenced to LWOP, even if his crime reflects transient immaturity. *Ante,* at 7 (quoting *Miller*, 567 U. S., at 476). It does not matter whether the sentencer meaningfully considers youth: The Court assumes it will, see *ante,* at 15, but ultimately, the mere existence of "a discretionary sentencing procedure suffices," *ante,* at 19.

The Court rests its conclusion on *Montgomery*'s modest statement that "*Miller* did not impose a formal factfinding requirement," and so "a finding of fact regarding a child's incorrigibility . . . is not required." 577 U. S., at 211. This statement is the linchpin of the Court's opinion. See *ante,* at 2, 5, 7, 11–14. As the Court quietly admits in a footnote, however, *Montgomery* went on to clarify that the fact "[t]hat *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." *Montgomery*, 577 U. S., at 211; see *ante,* at 7–8, n. 2 (quoting the same).

*Montgomery* was equally explicit elsewhere: "*Miller* . . . did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole." 577 U. S., at 208. Sentencing discretion and "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors" are necessary to "giv[e] effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity," but they "d[o] not replace" it. *Id.,* at 210. "Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects '"unfortunate yet transient immaturity."'" *Id.,* at 208. If a juvenile offender's crime "did not reflect irreparable corruption," his "hope for some years of life outside prison walls must be restored." *Id.,* at 213. The Court today never addresses *Montgomery*'s clear articulation of *Miller*'s essential holding.

The lone statement on which the Court fixates recognizes only that *Miller* does not mandate a particular procedure for considering a defendant's youth or explaining the sentencer's decision. *Miller* certainly does not require sentencers to invoke any magic words. Using this procedural

flexibility, States have adopted different approaches to *Miller*'s inquiry. For instance, in some States, the prosecution must prove that a juvenile offender is permanently incorrigible beyond a reasonable doubt; in others, the sentencing judge must make a formal finding of irreparable corruption on the record. See Brief for American Bar Association as *Amicus Curiae* 14–15, 19–21. As the Court correctly notes, *Miller* does not require any one of "those particular policy approaches." *Ante,* at 22.

What is necessary, however, is "that a sentencer decide whether the juvenile offender before it is a child whose crimes reflect transient immaturity or is one of those rare children whose crimes reflect irreparable corruption." *Tatum* v. *Arizona*, 580 U. S. \_\_\_, \_\_\_ (2016) (SOTOMAYOR, J., concurring in decision to grant, vacate, and remand) (slip op., at 3) (internal quotation marks omitted). That is all petitioner Brett Jones seeks. See Tr. of Oral Arg. 6 ("On the most fundamental level . . . what we need is a sentencing judge who understands that permanent incorrigibility is the dispositive rule and determines whether the defendant fits within that rule. And there are any number of ways that it could be done"); Brief for Petitioner 31 (challenging the "failure to find *in any form* whether Brett is permanently incorrigible"). As JUSTICE THOMAS recognizes, "there must be a determination as to whether Jones falls within th[e] protected class" of children who are ineligible for LWOP. *Ante,* at 6 (opinion concurring in judgment). Otherwise, the line between those who may be sentenced to LWOP and those who may not "is more fanciful than real." *Ibid.*

The Court attempts to paper over its mischaracterization of *Miller* and *Montgomery* in several ways. First, it claims that *Miller* barred only "*mandatory* life-without-parole sentences," not "*discretionary* life-without-parole sentences." *Ante,* at 4. *Miller* did prohibit mandatory LWOP sentences for juveniles. See 567 U. S., at 465. To say that *Miller* is

limited to mandatory LWOP sentences, however, is to ig-
nore half of its reasoning. *Miller* relied on "the confluence
of . . . two lines of precedent." *Id.,* at 470. In one line of
cases, the Court had interpreted the Eighth Amendment to
require that sentencers make individualized, discretionary
decisions when imposing the death penalty. For instance,
in *Lockett* v. *Ohio*, 438 U. S. 586 (1978), a plurality of the
Court concluded that "the sentencer, in all but the rarest
kind of capital case, [can]not be precluded from considering,
as a mitigating factor, any aspect of a defendant's character
or record and any of the circumstances of the offense." *Id.,*
at 604 (emphasis deleted; footnote omitted). *Miller* ex-
plained that mandatory LWOP sentences violate "individu-
alized sentencing cases" like *Lockett* because they "preclude
a sentencer from taking account of an offender's age and the
wealth of characteristics and circumstances attendant to
it." 567 U. S., at 476–477.

The Court now pretends that *Miller*'s reasoning ended
there. It insists that all *Miller* required was "a sentencing
procedure similar to the procedure that this Court has re-
quired for the individualized consideration of mitigating
circumstances in capital cases such as *Woodson* v. *North
Carolina*, 428 U. S. 280, 303–305 (1976) (plurality opinion),
*Lockett* v. *Ohio*, 438 U. S. 586, 597–609 (1978) (plurality
opinion), and *Eddings* v. *Oklahoma*, 455 U. S. 104, 113–115
(1982)." *Ante,* at 9. Reading that conclusion, one would ex-
pect *Miller* to have announced that it rested solely on those
cases.

*Miller* was clear, however, that it drew primarily from a
different line of precedent headed by *Roper* and *Graham*,
which "adopted categorical bans on sentencing practices
based on mismatches between the culpability of a class of
offenders and the severity of a penalty," regardless of the
procedures used to impose the sentences. *Miller*, 567 U. S.,
at 470. These cases set forth a substantive proportionality
principle that the individualized-sentencing cases did not:

"[L]ife-without-parole sentences, like capital punishment, may violate the Eighth Amendment when imposed on children" because "the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate." *Id.,* at 473.

Mandatory and discretionary sentencing schemes alike can produce disproportionate sentences. Regardless of how it is imposed, a juvenile death sentence is unconstitutional under *Roper*, and a juvenile sentence of LWOP for a non-homicide offense is unconstitutional under *Graham*. See *Roper*, 543 U. S., at 575 (holding "that the death penalty cannot be imposed upon juvenile offenders"); *Graham*, 560 U. S., at 74 (drawing a "clear line" against "life without parole for juvenile nonhomicide offenders"). So, too, with *Miller*: No set of discretionary sentencing procedures can render a sentence of LWOP constitutional for a juvenile whose crime reflects "unfortunate yet transient immaturity." 567 U. S., at 479 (internal quotation marks omitted).

The Court claims that *Miller* relied on *Roper* and *Graham* "for a simple proposition: Youth matters in sentencing." *Ante,* at 10. That is true, but the Court conflates two ways in which youth matters. When *Miller* was decided, the Court's individualized-sentencing cases had already firmly established "that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury." *Johnson* v. *Texas*, 509 U. S. 350, 367 (1993); see also *Eddings* v. *Oklahoma*, 455 U. S. 104, 116 (1982) (requiring that sentencers consider "the chronological age of a minor" and "the background and mental and emotional development of a youthful defendant"). The *Miller* Court thus did not need to cite *Roper* and *Graham* as a separate "stran[d] of precedent," *Miller*, 567 U. S., at 470, for that long-recognized proposition. It drew on *Roper* and *Graham* instead to set a substantive limit on the imposition of LWOP on juvenile offenders, even when they commit homicide. The Court today reverses course and concludes

that youth does not matter in this way.

Next, the Court exaggerates the meaning of two state-ments from *Miller*, arguing that it "mandated 'only that a sentencer follow a certain process,'" rather than "'categori-cally bar[ring] a penalty for a class of offenders or type of crime[,] as, for example, we did in *Roper* or *Graham*.'" *Ante,* at 7, 10 (quoting *Miller*, 567 U. S., at 483). Again, *Mont-gomery* already rejected this misinterpretation: "*Miller*, it is true, did not bar a punishment for all juvenile offenders," or all juvenile offenders convicted of certain crimes, "as the Court did in *Roper* or *Graham*." 577 U. S., at 209. "*Miller* did bar life without parole, however, for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Ibid.* To "separate those juveniles who may be sentenced to life without parole from those who may not," as *Miller* requires, sentencers must follow a certain process: conducting a "hearing where 'youth and its at-tendant characteristics' are considered." 577 U. S., at 210. That process is not an end in itself. Rather, it "gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transi-ent immaturity." *Ibid.*

Finally, the Court argues that *Miller* offered nothing more than a prediction that "a discretionary sentencing pro-cedure would help make life-without-parole sentences rela-tively rare." *Ante,* at 13. *Miller*'s substantive rule was not a prediction. Rather, *Miller* held that juvenile LWOP sen-tences must be rare because it is only "the rare juvenile of-fender whose crime reflects irreparable corruption." 567 U. S., at 479–480 (internal quotation marks omitted). Simply put, there are very few juveniles for whom the "'sig-nature qualities'" of youth do not undermine the penologi-cal justifications for LWOP. *Id.,* at 476. Youth is "a time of immaturity, irresponsibility, impetuousness, and reckless-ness," and, almost invariably, those "qualities are all tran-

sient." *Ibid.* (internal quotation marks and brackets omitted).

In any event, the data since *Miller* prove that sentencing discretion alone will not make LWOP a rare sentence for juvenile offenders. Even after *Montgomery*, Mississippi courts require only that a sentencer consider youth-related factors "in a non-arbitrary fashion" before imposing a sentence of LWOP. See, *e.g., Miller* v. *State*, ___ So. 3d ___, ___, 2020 WL 2892820, \*5 (Miss. App., June 2, 2020). Unbound by *Miller*'s essential holding, more than a quarter of Mississippi's resentencings have resulted in the reimposition of LWOP. See Brief for Juvenile Law Center et al. as *Amici Curiae* 20.[1]

Pennsylvania, in contrast, has recognized that "*Miller* requires far more than mere consideration of an offender's age," as "a life-without-parole sentence imposed on a juvenile is illegal" unless "the defendant will forever be incorrigible, without any hope for rehabilitation." *Commonwealth* v. *Batts*, 640 Pa. 401, 440, 444, 163 A. 3d 410, 433, 435 (2017). Pennsylvania has adopted a number of procedures to guide sentencing courts in applying *Miller*'s rule, including a presumption against juvenile LWOP that the State must rebut through proof beyond a reasonable doubt. 640 Pa., at 476, 163 A. 3d, at 454–455. Fewer than 2 percent of resentencings in Pennsylvania have resulted in the reimposition of LWOP. See The Campaign for the Fair Sentencing of Youth, Tipping Point: A Majority of States Abandon Life-Without-Parole Sentences for Children 7 (2018) (Tipping

––––––––

[1] Elsewhere, the numbers are even more alarming. Like Mississippi courts, Louisiana courts have concluded that "*Miller* requires the sentencing court to consider an offender's youth and attendant characteristics as mitigating circumstances." *State* v. *Keith*, 51,389, p. 3 (La. App. 2 Cir. 6/21/17), 223 So. 3d 767, 770. As of 2020, Louisiana has imposed LWOP on an astonishing 57 percent of eligible juvenile offenders since *Miller* was decided. See Louisiana Center for Children's Rights, Louisiana's Compliance with *Miller* v. *Alabama* 1 (2020).

Point).

These States' experiences show that juvenile LWOP sentences will not be rare simply by virtue of sentencing discretion. Sentencers will not "necessarily . . . consider the defendant's youth," *ante,* at 15, and they certainly will not necessarily conduct *Miller*'s essential inquiry. If sentencing discretion is all that is required, far too many juvenile offenders will be sentenced to die in prison.[2]

### B

The Court's misreading of *Miller* and *Montgomery* is egregious enough on its own. The Court twists precedent even further, however, by distorting *Miller* in a way that cannot be reconciled with *Montgomery*'s holding that *Miller* applies retroactively under the *Teague* doctrine. See *ante,* at 7 (opinion of THOMAS, J.). That doctrine divides new rules of constitutional law into two categories: substantive and procedural. As noted above, *Montgomery* held that *Miller* applies retroactively based solely on "*Teague*'s first exception for substantive rules." 577 U. S., at 200. For *Montgomery* to make any sense, then, *Miller* must have done more than mandate a certain procedure. Rather, it "eliminated a State's power to . . . impose a given punishment." 577 U. S.,

––––––––––

[2] The harm from these sentences will not fall equally. The racial disparities in juvenile LWOP sentencing are stark: 70 percent of all youths sentenced to LWOP are children of color. See Tipping Point 10; see also Brief for Juvenile Law Center et al. as *Amici Curiae* 21 (reporting that "[i]n the years before *Graham* and *Miller*, courts sentenced Black juvenile offenders to life imprisonment without parole ten times more often than white offenders"); Mills, Dorn, & Hritz, Juvenile Life Without Parole in Law and Practice: Chronicling the Rapid Change Underway, 65 Am. U. L. Rev. 535, 579–580 (2016) ("Non-whites are overrepresented among the JLWOP population in ways perhaps unseen in any other aspect of our criminal justice system"). The trend has worsened since *Miller* v. *Alabama*, 567 U. S. 460 (2012): 72 percent of children sentenced to LWOP after *Miller* were Black, compared to 61 percent of children sentenced before *Miller*. Tipping Point 10.

at 201.[3]

Today, however, the Court transforms *Miller* into a decision requiring only a "discretionary sentencing procedure." *Ante,* at 19. At the same time, the Court insists that it "does not disturb" *Montgomery*'s holding "that *Miller* applies retroactively on collateral review." *Ante,* at 19. In other words, the Court rewrites *Miller* into a procedural rule and, paradoxically, maintains that *Miller* was nevertheless "substantive for retroactivity purposes." *Ante,* at 11.

That explanation undoes *Teague*'s distinction between substantive and procedural rules. If a rule that requires only a sentencing procedure is substantive for retroactivity purposes, then this Court has improperly classified numerous sentencing rules as procedural. To take one example, in *Mills* v. *Maryland*, 486 U. S. 367 (1988), this Court invalidated a capital sentencing procedure requiring jurors to disregard mitigating factors that were not found unanimously. That holding was procedural because it altered only "the range of permissible methods for determining whether a defendant's conduct is punishable by death." *Schriro* v. *Summerlin*, 542 U. S. 348, 353 (2004). Under the Court's logic today, however, the rule in *Mills* and other rules of sentencing procedure should have applied retroactively, even though the Court has held that they do not. See

––––––––––

[3] JUSTICE THOMAS agrees that *Montgomery* mandates such a reading of *Miller*, but he claims that *Miller* itself did not establish a substantive rule. See *ante,* at 2–5. That is incorrect. As discussed, *Miller* prohibited mandatory LWOP sentences not only because mandatory sentencing precludes individualized consideration of a juvenile's youth, but also because "such a scheme poses too great a risk of disproportionate punishment." 567 U. S., at 479. Applying the principles of proportionality set forth in *Roper* and *Graham*, *Miller* "rendered life without parole an unconstitutional penalty for a class of defendants because of their status[,] that is, juvenile offenders whose crimes reflect the transient immaturity of youth." *Montgomery*, 577 U. S., at 208 (internal quotation marks omitted). As a result, "*Miller* is no less substantive than are *Roper* and *Graham*." *Id.,* at 209.

*Beard* v. *Banks*, 542 U. S. 406, 416–417 (2004) (holding that *Mills* announced a procedural rule); *Schriro*, 542 U. S., at 354 (treating as procedural the rule set forth in *Ring* v. *Arizona*, 536 U. S. 584 (2002), that a jury, rather than a judge, must find aggravating circumstances necessary for the imposition of the death penalty). If future litigants make such arguments, it will be because the Court's contortion of *Miller* and *Montgomery* paves the way for them to do so.

C

Rather than read *Miller* and *Montgomery* fairly, the Court reprises Justice Scalia's dissenting view in *Montgomery* that *Miller* requires only a "youth-protective procedure." 577 U. S., at 225 (emphasis deleted). Justice Scalia's view did not prevail, however. *Montgomery*'s interpretation of *Miller* is binding precedent, just as *Miller* itself is.

Any doubts the Court may harbor about the merits of those decisions do not justify overruling them. See *June Medical Services L. L. C.* v. *Russo*, 591 U. S. ___, ___ (2020) (ROBERTS, C. J., concurring in judgment) (slip op., at 3) ("[F]or precedent to mean anything, the doctrine must give way only to a rationale that goes beyond whether the case was decided correctly"). As this Court has consistently reiterated, "a departure from precedent demands special justification." *Gamble* v. *United States*, 587 U. S. ___, ___ (2019) (slip op., at 11) (internal quotation marks omitted); accord, *Kisor* v. *Wilkie*, 588 U. S. ___, ___–___ (2019) (slip op., at 25–26); *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 455–456 (2015).

The Court offers no such justification today. Nor could it. The traditional *stare decisis* factors include the quality of the precedent's reasoning, its consistency with other decisions, legal and factual developments since the precedent was decided, and its workability. See *Ramos*, 590 U. S., at ___ (opinion of KAVANAUGH, J.) (slip op., at 7). None supports overturning *Miller* or *Montgomery*. As explained

above, those decisions are firmly rooted in two lines of precedent and fundamental principles of proportionality.[4]  Subsequent legal and factual developments have reinforced their reasoning.  Fifteen state courts of last resort, for instance, have recognized that *Miller* announced a substantive rule barring LWOP for any juvenile whose crime does not reflect permanent incorrigibility.  See Reply Brief 18, n. 6.  Twenty States and the District of Columbia have changed their policies to prohibit LWOP sentences for all juvenile offenders, including a number of States that "had discretionary sentencing schemes or a mixture of both mandatory and discretionary sentences."  Brief for Former West Virginia Delegate John Ellem et al. as *Amici Curiae* in *Mathena* v. *Malvo*, O. T. 2019, No. 18–217, pp. 34–35; S. 256, 133d Gen. Assembly (Ohio 2020); Va. Code Ann. §53.1– 165.1 (2020).  Finally, *Miller* and *Montgomery* have not proved unworkable: To the contrary, they have spurred reforms across the country while "avoid[ing] intruding more than necessary upon the States' sovereign administration of their criminal justice systems."  *Montgomery*, 577 U. S., at 211.  Requiring sentencers to make an explicit or implicit determination of permanent incorrigibility before sentencing a juvenile offender to LWOP imposes no costs that justify overturning precedent.

Instead of addressing these factors, the Court simply rewrites *Miller* and *Montgomery* to say what the Court now wishes they had said, and then denies that it has done any such thing.  See *ante,* at 19.  The Court knows what it is

---

[4] JUSTICE THOMAS claims that *Miller* and *Montgomery* "refashio[n] the Eighth Amendment to accommodate this Court's views of juvenile justice." *Ante,* at 2; see *ante,* at 8.  In so doing, JUSTICE THOMAS "seek[s] to relitigate old Eighth Amendment battles" based on "arguments this Court has previously (and often) rejected." *Miller*, 567 U. S., at 470–471, n. 4; see *Graham* v. *Florida*, 560 U. S. 48, 58 (2010) ("To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society" (internal quotation marks omitted)).

doing. It admits as much. Rather than try to harmonize its decision today with *Montgomery*'s retroactivity holding, it confesses in a footnote that its rewriting of precedent is inconsistent with *Montgomery* and basic retroactivity principles. See *ante,* at 11–12, n. 4. The Court's solution? It urges lower courts to simply ignore *Montgomery* going forward. *Ante,* at 11–12, n. 4 ("[T]he Court's retroactivity precedents that both pre-date and post-date *Montgomery* . . . and not *Montgomery* . . . must guide the determination of whether rules other than *Miller* are substantive").[5] Instead of "disturb[ing]" *Montgomery*'s retroactivity holding, *ante,* at 12, n. 4, the Court attempts to bury it.

How low this Court's respect for *stare decisis* has sunk. Not long ago, that doctrine was recognized as a pillar of the "'rule of law,'" critical to "keep the scale of justice even and steady, and not liable to waver with every new judge's opinion." *Ramos*, 590 U. S., at ___–___ (opinion of KAVANAUGH, J.) (slip op., at 1–2) (internal quotation marks omitted). Given these weighty interests, the Court "usually require[d] that a party ask for overruling, or at least obtain[ed] briefing on the overruling question," and then "carefully evaluate[d] the traditional *stare decisis* factors." *Barr* v. *American Assn. of Political Consultants, Inc.*, 591 U. S. ___, ___, n. 5 (2020) (slip op., at 9, n. 5). Now, it seems, the Court is willing to overrule precedent without even acknowledging it is doing so, much less providing any special justification. It is hard to see how that approach is "founded in the law rather than in the proclivities of individuals." *Ramos*, 590 U. S., at ___ (opinion of KAVANAUGH, J.) (slip op., at 2) (internal quotation marks omitted).

For present purposes, sentencers should hold this Court

---

[5] Of course, as already discussed, the Court is perfectly content to rely on *Montgomery* for its statement that a finding of fact regarding permanent incorrigibility is not required. That isolated piece of *Montgomery*, apparently, still carries the full weight of precedent. Anything more inconvenient, however, the Court today discards.

to its word: *Miller* and *Montgomery* are still good law.[6]  See *ante,* at 19 ("Today's decision does not overrule *Miller* or *Montgomery*").  Sentencers are thus bound to continue applying those decisions faithfully.  Thankfully, many States have already implemented robust procedures to give effect to *Miller* and *Montgomery*.  In other States, the responsibility falls squarely on individual sentencers to use their discretion to "separate those juveniles who may be sentenced to life without parole from those who may not." *Montgomery*, 577 U. S., at 210.  Failing to do so violates the Eighth Amendment.

## III

Brett Jones, like all juvenile offenders facing a sentence of LWOP, deserves an answer to *Miller*'s essential question: whether his crime demonstrates that he is permanently incorrigible.  Ordinarily, an appellate court should not pass on that question in the first instance.  But the Court today guarantees that the state sentencing court will never have to give Jones an answer.  It thus bears acknowledging that, based on the evidence presented below, it is hard to see how Jones is one of the rare juvenile offenders "whose crime reflects irreparable corruption." *Miller*, 567 U. S., at 479–480 (internal quotation marks omitted).  In fact, many aspects of Jones' crime seem to epitomize "unfortunate yet transient immaturity." *Id.,* at 479 (internal quotation marks omitted); see 2018 WL 10700848, \*11 (Miss., Nov. 27, 2018)

———————

[6]The Court leaves open the possibility of an "as-applied Eighth Amendment claim of disproportionality." *Ante,* at 21 (citing *Harmelin* v. *Michigan*, 501 U. S 957, 996–1009 (1991) (Kennedy, J., concurring in part and concurring in judgment)).  In the context of a juvenile offender, such a claim should be controlled by this Court's holding that sentencing "a child whose crime reflects transient immaturity to life without parole . . . is disproportionate under the Eighth Amendment." *Montgomery*, 577 U. S., at 211; see *Miller*, 567 U. S., at 481 ("*Harmelin* had nothing to do with children and did not purport to apply its holding to the sentencing of juvenile offenders").

(Kitchens, P. J., dissenting) ("Jones's actions reflect [the hallmark] features [of youth] at every turn").[7]

Jones killed his grandfather just 23 days after Jones' 15th birthday. App. 71. In his short life before the murder, Jones was the victim of violence and neglect that he was too young to escape. Jones' biological father was an alcoholic who physically abused Jones' mother, knocking out her teeth and breaking her nose on several occasions. *Id.,* at 71–72. The two separated when Jones was two years old. *Id.,* at 71. Jones' mother then married Jones' stepfather, who was also abusive, especially toward Jones. He beat Jones with belts, switches, and a paddle labeled "The Punisher." *Id.,* at 39–40, 78, 81. He rarely called Jones or his brother by their names, preferring cruel epithets. *Id.,* at 77, 81, 101 ("[H]is favorite thing to call them was little motherf***ers"). According to Jones' mother, Jones' stepfather "hated Brett more because Brett reminded him of [Jones' biological father]." *Id.,* at 78. According to Jones' grandmother, he was simply "easier to hurt and beat." *Id.,* at 39.

In 2004, after Jones came home late one day, Jones' stepfather flew into a rage and grabbed Jones by the neck, preparing to beat him with a belt. *Id.,* at 128–129. This time, however, Jones fought back and told his stepfather, "No,

_____

[7] Even as it disclaims any responsibility for evaluating permanent incorrigibility, the Court emphasizes the details of Jones' crime and alludes to other homicides committed by juveniles throughout the country. See *ante,* at 2–3, 6. The gravity of these violent acts was not lost on the Court in *Miller*, which set forth its substantive rule specifically for the subset of juvenile offenders who commit homicide. See also *Roper*, 543 U. S., at 572 ("[W]e cannot deny or overlook the brutal crimes too many juvenile offenders have committed"). Notwithstanding the unique "moral culpability and consequential harm" of homicide, *Miller* reasoned that *Graham*'s insights about children "are evident in the same way, and to the same degree." 567 U. S., at 473. The point of *Miller* and *Montgomery* is that juveniles, even those who commit murder, have the capacity to grow and mature, to rehabilitate. The Eighth Amendment requires that sentencers (and reviewing courts) not presume that most juveniles will forever remain the "murderers," *ante,* at 10, they once were.

you're not going to hit me ever again." *Id.,* at 80. Jones took a swing at his stepfather and split open his ear. *Ibid.* The police were called, and Jones was arrested.[8] *Ibid.* Jones' stepfather then threatened to kick out Jones' mother and brother if Jones did not move out. *Id.,* at 81. As a result, Jones' grandparents picked him up less than two months before the murder and brought him to Mississippi. *Id.,* at 47.

When he moved, Jones lost access to medications that he had been taking for mental health issues. *Id.,* at 38–39.[9] When he was 11 or 12 years old, Jones began cutting himself so that he "would not feel the panic and the hurt that was inside of [his] head." *Id.,* at 75. He later experienced hallucinations and was prescribed antidepressant medications. *Id.,* at 92, 124. These medications were supposed to be tapered off gradually. *Id.,* at 38–39. When Jones left for Mississippi, however, they were abruptly cut off.

The murder was precipitated by a dispute over Jones' girlfriend. After Jones moved, his girlfriend ran away from her home in Florida to stay at Jones' grandparents' home in secret. 938 So. 2d 312, 313 (Miss. App. 2006). On the day of the murder, Jones' grandfather, Bertis Jones, discovered that Jones' girlfriend had been staying in their home. *Ibid.*

---

[8] This was Jones' only prior contact with the juvenile justice system. See Brief for Petitioner 35.

[9] Jones' mother has also been diagnosed with a number of conditions, including posttraumatic stress disorder, bipolar disorder, and manic depression. App. 74. As a result, throughout Jones' life, she experienced panic attacks and emotional breakdowns. *Id.,* at 74–75. As a child, Jones witnessed his mother cutting herself. *Id.,* at 122–123. The types of adverse childhood experiences that Jones endured, including physical abuse, domestic violence, and mental illness in family members, are strong predictors of negative outcomes for children, including violence. J. Garbarino, *Miller*'s Children 10–12 (2018); see *id.,* at 12 ("[E]levated adversity scores are as common among killers as they are rare in the general adolescent population").

He ordered her out. *Ibid.* Later that day, Jones was making a sandwich in the kitchen using a steak knife. *Id.,* at 314. Jones said something disrespectful to his grandfather, who started yelling. *Ibid.* The two began pushing each other, and Jones' grandfather tried to hit him. *Ibid.* Jones stabbed his grandfather with the steak knife. *Ibid.* Jones' grandfather came at Jones again, and the fight continued. *Ibid.* Jones ultimately stabbed his grandfather eight times, grabbing a second knife when the first one broke. 2018 WL 10700848, *7 (Kitchens, P. J., dissenting).

No one disputes that this was a terrible crime. *Miller,* however, held that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." 567 U. S., at 472. Jones' crime reflects these distinctive attributes: "That a teenager in trouble for having been caught concealing his girlfriend at his grandparents' home would attempt to solve the problem by resorting to violence dramatically epitomizes immaturity, impetuosity, and failure to appreciate risks or consequences." 2018 WL 10700848, *11 (Kitchens, P. J., dissenting).

Jones then attempted to save his grandfather by administering CPR. 938 So. 2d, at 314. When that failed, he clumsily tried to hide what he had done. 2018 WL 10700848, *11 (Kitchens, P. J., dissenting). He was spotted walking around in plain sight, covered in blood, trembling and muttering to himself. *Ibid.* When a neighbor questioned him, Jones told a feeble lie, claiming that his grandfather had left and that the blood on his clothes was "'a joke.'" 938 So. 2d, at 314. Jones then met up with his girlfriend and attempted to hitchhike, but not to make a getaway. Instead, he was trying to go see his grandmother to tell her what had happened. *Id.,* at 315. The police stopped Jones, found that he was carrying a pocket knife, and asked if it was the knife he "'did it with.'" *Ibid.* Jones replied,

"'No, I already got rid of it.'" *Ibid.* He then agreed to be interviewed by three police detectives, "without invoking his right to silence or his right to counsel and without a parent or guardian present." 2018 WL 10700848, *11 (Kitchens, P. J., dissenting). Thus, "Jones's behavior in the immediate aftermath of his tragic actions also demonstrated his fundamental immaturity." *Ibid.*

At his resentencing hearing, Jones provided evidence that not only is he capable of rehabilitation, but he had in fact already matured significantly since his crime. In more than five years in prison, Jones committed only two disciplinary infractions. App. 134–135. While incarcerated, Jones earned his GED and sought out work, becoming a "very good employee." *Id.,* at 106, 109, 153. Jones and his prison unit manager often discussed the Bible, and in time, his unit manager came to think of Jones "almost like [a] son." *Id.,* at 107. Jones confided in him that Jones "regretted" what he had done. *Id.,* at 112.

Jones' grandmother (Bertis Jones' widow) testified at Jones' resentencing hearing and submitted an *amicus* brief to this Court. She remains "steadfast in her belief that Brett is not and never was irreparably corrupt." Brief for Madge Jones et al. as *Amici Curiae* 4. She speaks with Jones weekly, encouraging him as he takes college courses and serves in the prison ministry. *Ibid.* Jones' younger brother, Marty, and his other family members have also stayed by his side.

This significant body of evidence does not excuse Jones' crime. It does mean, however, that under *Miller* and *Montgomery*, there is a strong likelihood that Jones is constitutionally ineligible for LWOP. His crime, while terrible, appears to have been the product of "unfortunate yet transient immaturity." *Miller*, 567 U. S., at 479 (internal quotation marks omitted). Notably, the State called no witnesses and offered no evidence at the resentencing hearing to rebut Jones' proof that his crime reflected the "recklessness" and

"impulsivity" characteristic of juveniles. *Montgomery*, 577 U. S., at 207 (internal quotation marks omitted); see App. 23, 136.

In resentencing Jones to LWOP, the sentencing court failed to apply *Miller* properly. Instead, it followed the instructions of the Mississippi Supreme Court, which held that "*Miller* rendered [Mississippi's] sentencing scheme unconstitutional if, and only if, the sentencing authority fails to take into account characteristics and circumstances unique to juveniles." 122 So. 3d 698, 702 (2013). Thus, the sentencing court simply considered the "*Miller* factors" as part of the "mitigating and the aggravating circumstances." App. 149. It never addressed *Miller*'s central inquiry: whether Jones is one of the rare juveniles whose crimes reflect irreparable corruption. 567 U. S., at 479–480. Because the sentencing court failed to ask and answer this critical question, Jones' sentence should not stand.

## IV

It is important not to lose sight of what is at stake in this case. "The Eighth Amendment's prohibition of cruel and unusual punishment guarantees individuals the right not to be subjected to excessive sanctions." *Miller*, 567 U. S., at 469 (internal quotation marks omitted). In *Roper*, *Graham*, *Miller*, and *Montgomery*, the Court recognized that this guarantee has special significance for children. The Eighth Amendment does not excuse children's crimes, nor does it shield them from all punishment. It does, however, demand that most children be spared from punishments that "giv[e] no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope." *Graham*, 560 U. S., at 79.

Jones and other juvenile offenders like him seek only the possibility of parole. Not the certainty of release, but the opportunity, at some point in their lives, to show a parole board all they have done to rehabilitate themselves and to

ask for a second chance. Jones recognizes that the parole board may ultimately decide he must spend his entire life behind bars. He simply requests that the State not "mak[e] the judgment at the outset that [he] never will be fit to reenter society." *Id.,* at 75. The Eighth Amendment requires that most juvenile offenders be given this small "hope for some years of life outside prison walls." *Montgomery*, 577 U. S., at 213.[10]

At his resentencing hearing, Jones told the court, "I'm not the same person I was when I was 15. . . . I've become a pretty decent person in life. And I've pretty much taken every avenue that I could possibly take in prison to rehabilitate myself." App. 152. "Minors do have the ability to change," he reflected. *Ibid.* He noted in closing, "If you decide to send me back without the possibility of parole, I will still do exactly what I've been doing for ten years. But all I can do is ask you . . . please give me just one chance to show the world, man, like, I can be somebody. I've done everything I could over the past ten years to be somebody. . . . I can't change what was already done. I can just try to show . . . I've become a grown man." *Id*., at 153. Today, Jones is 31. His time spent in prison has now eclipsed the childhood he had outside of it.

Jones should know that, despite the Court's decision today, what he does in life matters. So, too, do the efforts of the almost 1,500 other juvenile offenders like Jones who are serving LWOP sentences. Of course, nothing can repair the damage their crimes caused. But that is not the question.

_____

[10] Having deprived Jones of his constitutional right, the Court gestures at a potential lifeline from other institutions, including the Mississippi Legislature or Governor. *Ante,* at 22. But "the remote possibility" of such action "does not mitigate the harshness of the sentence" that Jones now faces. *Graham*, 560 U. S., at 70. The Eighth Amendment guarantees juvenile offenders like Jones a basic constitutional protection against disproportionate punishments. The Court should not leave the vindication of such important legal rights to others, or to chance.

The question is whether the State, at some point, must consider whether a juvenile offender has demonstrated maturity and rehabilitation sufficient to merit a chance at life beyond the prison in which he has grown up.  See *Graham*, 560 U. S., at 79.  For most, the answer is yes.