NOTICE

Decision filed 09/07/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220072-U

NOS. 5-22-0072, 5-22-0094 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | Nos. 94-CF-833, 94-CF-835 |
| | ) | |
| TYRONE HUMPHREY, | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: Following a second resentencing hearing, the trial court did not abuse its discretion in sentencing defendant to life sentences where the trial court properly applied the juvenile sentencing factors, considered the seriousness of defendant's offenses, and considered defendant's ability to be rehabilitated.

¶ 2    Defendant, Tyrone Humphrey, appeals the trial court's imposition of life sentences stemming from two separate cases that were consolidated following a second resentencing hearing. On appeal, he argues that the trial court's sentences were unconstitutionally excessive under the eighth amendment and the proportionate penalties clause of the Illinois Constitution because the life sentences reflected the sentencing court's failure to properly apply the juvenile sentencing factors in *Miller v. Alabama*, 567 U.S. 460 (2012), codified at section 5-4.5-105 of the Unified

1

Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2022)). For the following reasons, we affirm.

¶ 3                                      I. BACKGROUND

¶ 4      On July 28, 1994, defendant, who was a 16-year-old living with his parents in Indiana, visited his aunt and cousins in Decatur, Illinois. While there, he went to Ali's Market with his cousins, Contrell Williams and Mark Williams, to rob the store. At the time, Mark was 16 years old and Contrell was 17 years old. Defendant grabbed a brick on his way into the store. Contrell was armed with a handgun. Defendant ran behind the store owner, Mike Aliabadi, grabbed him by the neck, placed the brick at the back of Aliabadi's head, and ordered Aliabadi to give up all his money. Aliabadi opened the register. Defendant and Contrell removed money but were unable to remove the cash register's tray, so Contrell fired a shot into the register to remove the tray. Defendant and Mark left the store, but defendant returned to the store and demanded Aliabadi give him the keys to the truck parked outside. Aliabadi gave defendant a key, and defendant left the store but returned again because the key did not work. Contrell then shot Aliabadi in both arms.

¶ 5      Ten days later, on August 9, 1994, defendant and Contrell were outside by a payphone when 17-year-old Shane Storm and 16-year-old Matthew Whitacre stopped nearby in a car. Defendant and Contrell asked for a ride and entered the backseat. Shane was driving and allegedly stated he had $50 to purchase drugs. Defendant advised Shane that drugs could be purchased near Torrence Park. After arriving at Torrence Park, defendant and Contrell decided to rob the men. Defendant displayed a handgun and Contrell ordered Shane into the backseat, at which time Shane gave defendant the $50. Contrell drove the car down a dirt road by the lake. When Contrell stopped the car, he and defendant ordered Shane and Matthew out of the car. Contrell looked at defendant and said, "do it." Defendant led Shane and Matthew further down the road, ordered them to lay

2

down, and put their hands behind their head. Defendant then shot Matthew twice in the back of the head and shot Shane three times in the back of the head. Their bodies were later discovered with their hands still behind their heads.

¶ 6 Defendant and Contrell then drove Shane's car to Torrence Park, doused the vehicle in gasoline, and set the car on fire. Eight days later, defendant would celebrate his seventeenth birthday in Indiana.

¶ 7 Defendant returned to Decatur, Illinois, on September 5, 1994. During this visit, he borrowed his girlfriend's car and decided to rob a Huck's Market with Contrell. They parked the car in a nearby residential area and walked to the store, where Sheri Ellis worked as a clerk. After entering the store, defendant knocked the security camera to the floor while Contrell demanded money from Sheri, who handed Contrell $32. Defendant removed the VCR from the security system and took the VCR and a carton of cigarettes from the store. Four gunshots were heard after defendant left the store. Sheri was later discovered in a pool of blood on the store's floor. She was taken to the hospital but died from her injuries.

¶ 8 On September 18, 1994, defendant and Contrell were each charged, by information, with numerous counts of first-degree murder related to the death of Sheri. In a separate case, defendant and Contrell were charged, by information, with numerous counts of first-degree murder related to the deaths of Shane and Matthew. Defendant was arrested and confessed to his involvement in the three offenses. He took officers to the scene where Shane and Matthew's bodies were found. Police later found the VCR stolen from Huck's and identified defendant's and Contrell's fingerprints on the VCR.

¶ 9 On February 16, 1995, a jury convicted defendant of first-degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 1992)) for Sheri's death. The trial court sentenced defendant to a term of natural

3

life after finding his conduct was "exceptionally heinous behavior which is truly indicative of wanton cruelty." The appellate court affirmed the conviction following defendant's appeal. *People v. Humphrey*, 284 Ill. App. 3d 1146 (1996) (table) (unpublished order under Supreme Court Rule 23).

¶ 10    On April 19, 1995, a second jury convicted defendant of two counts of first-degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 1992)) for the deaths of Matthew and Shane. The court sentenced defendant to mandatory natural life imprisonment without the possibility of parole due to defendant's convictions for multiple murders. The appellate court affirmed both convictions. *People v. Humphrey*, 281 Ill. App. 3d 1148 (1996) (table) (unpublished order under Supreme Court Rule 23).

¶ 11    On July 21, 2013, defendant filed two postconviction petitions pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2012)). The petitions alleged that defendant's life sentences for the murders of Sheri, Matthew, and Shane were unconstitutional under both the United States and Illinois Constitutions in light of the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012). The State conceded defendant was entitled to a new sentencing hearing to address the *Miller* factors.

¶ 12    Following the submission of a presentencing investigative report (PSI), a joint resentencing hearing for both cases was held. At that hearing, Detective McElroy testified that in 1994 he worked as a detective and was involved in the investigation of an armed robbery at Ali's Market on July 29, 1994. He explained the events of that robbery.

¶ 13    Detective McElroy testified that defendant admitted robbing Ali's Market with Contrell Williams and Mark Williams. He was the male who picked up the brick and held it to Mr. Aliabadi's back. He also admitted grabbing the money. The detective testified that his investigation

revealed that Contrell fired the shots in this incident, and identified photographs taken from Ali's Market following the incident.

¶ 14    Detective McElroy was also on duty on August 10, 1994. A call was received around 11:40 a.m. stating that bodies were found. Detective McElroy was 20 seconds away from the location, was the first officer on scene, and spoke to the witness. He observed Shane and Matthew lying face down, their hands behind their heads, and blood on their hands. The officer identified the photographs taken at the scene and stated the vehicle the victims had been driving was found at 12:57 a.m. on the basketball court at Torrence Park. The vehicle had been set on fire. Detective McElroy interviewed defendant about this incident, at which time defendant confessed, including admitting to personally discharging the firearm that killed both Shane and Matthew.

¶ 15    Detective McElroy also testified that he was involved with the investigation of Sheri Ellis's murder that occurred on September 5, 1994, at the Huck's store in Decatur. Sheri was found at 11:43 p.m. that night, face down in a pool of blood at the store. She was later taken to the hospital where she passed away. The officer identified photographs from the scene, confirmed the victim was shot multiple times, and that multiple shell casings were found at the scene.

¶ 16    The officer also interviewed defendant and defendant admitted that he and Contrell carried out this crime. Detective McElroy confirmed that the bullets and casings from all three crime scenes were examined, and it was determined that all the bullets were fired from the same gun. He confirmed the weapon was never recovered.

¶ 17    Following admission of the exhibits, victim impact statements were read by Karryl Ellis on behalf of her and her husband Randy, who was Sheri's brother. She also read a victim impact statement written by Sheri's sister, Connie Ellis. Sheri's nephew, Kevin Moran, had the State read

5

his statement. Julia Whitacre, Matthew's mother, also had her statement read by the State. Additional victim impact statements were presented and reviewed by the court. The State rested.

¶ 18    Defense counsel provided the testimony of defendant's mother, Ruth Miller. Ms. Miller stated there was a lack of supervision over defendant at the time. She was married and defendant had five siblings. She stated their neighborhood was initially nice but after that "it just went straight to drugs, and all kinds of stuff was going on in that neighborhood." She stated that between age 14 and 16, defendant stopped going to school where he was an A student and stopped helping at home. After that he just started running around with his friends; she did not know where he was and would look for him all night. She stated that she later determined defendant was getting high daily. She stated that defendant's July 1994 visit was the first time he ever left home, and he was there to visit Ms. Miller's sister and her children. Thereafter, defendant provided a statement in allocution.

¶ 19    Following arguments and consideration of the statutory factors, the trial court found that defendant's behavior in the murders of Matthew and Shane was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. The court also found Sheri's murder "exceptionally brutal or heinous behavior indicative of wanton cruelty." The court resentenced defendant to natural life imprisonment without the possibility of parole in both cases.

¶ 20    Defendant appealed listing three issues that included: (1) improper consideration of the *Miller* factors, (2) a denial of due process where the trial court failed to admonish him of the right to choose to be sentenced under the statute as it existed on the date of the offense or on the date of the resentencing, and (3) that his life sentences violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *People v. Humphrey*, 2021 IL App (4th) 190201-U, ¶ 31. The State conceded error as to

6

the second issue and the appellate court accepted the concession. *Id.* ¶¶ 33-34. The appellate court reversed the trial court's judgment and remanded for resentencing. *Id.* ¶ 37.

¶ 21 The third sentencing hearing was held on February 1, 2022. Defendant chose to be sentenced under the law applicable on the date of the resentencing hearing, *i.e.*, the 2022 sentencing statutes. The parties agreed to admit the PSI filed on October 5, 2021. The PSI indicated defendant's childhood revealed no abuse. He lived with his mother, stepfather, and five siblings. He was never married and reported that he had a daughter, aged 26. He reported difficulty with reading comprehension at school, for which he received tutoring and special education prior to dropping out of high school at the end of his freshman year of high school. He no longer believed that he had any reading or writing disability due to other inmates assisting him and teaching himself. Defendant was never employed and described himself as physically and emotionally healthy. He smoked 5-6 joints of cannabis daily when he was 14 or 15 and drank alcohol a total of five times during the same period.

¶ 22 The State submitted defendant's disciplinary records from the Illinois Department of Corrections (IDOC) revealing numerous citations since defendant's imprisonment in 1995. More specifically, in 1995 defendant was cited for unauthorized property, abuse of privileges, violation of rules, and disobeying an order. In 1996, citations included disobeying an order, unauthorized movement, insolence, smoking, gang or unauthorized organization, intimidation and threats, misuse of property, and damage and abuse of property. In 1997, defendant was cited for disobeying a direct order, assault, insolence, violation of rules, unauthorized movement, dangerous disturbance, gang or unauthorized organization activity, and violation of other rules. In 1999, citations were issued for damage or misuse of property, disobeying a direct order, insolence, and violation of other rules, followed by citations from 2001-2004 for theft, damage to property,

7

disobeying a direct order, and possessing contraband (rope and a stapler). In 2005, citations were issued for insolence, disobeying a direct order, yelling, damage or misuse of property, solicitation, dangerous disturbances, conspiracy, gang or unauthorized organization activity, dangerous communications, and abuse of privileges. Additional citations from 2006 to 2013 included contraband, sexual misconduct, insolence, abuse of privileges, disobeying a direct order, violation of rules, intimidation, or threats. Citations from 2015 through 2019 included disobeying a direct order, violation of rules, intimidation or threats, dangerous communications, gang or unauthorized organization activity, abuse of privileges, and insolence. In addition to the IDOC citations, defendant was cited twice in the county jail while awaiting resentencing.

¶ 23    Victim impact statements were presented by Karryl Ellis, who read statements from Sheri Ellis's sister Connie, nephew Jeff, and nephew Kevin, along with a statement from Karryl and her husband. Julie Whitacre, Matthew's mother, also read a statement, and the State read a statement prepared by the Storm family. The State requested the court take judicial notice of Detective McElroy's testimony at the prior sentencing hearing that detailed the murders of Matthrew, Shane, and Sheri, as well as the attempted murder of Mike Aliabadi. Thereafter, the State rested.

¶ 24    Defendant presented letters from his mother and sister and a copy of defendant's College Guild workbook that focused on life skills development in a unit addressing TV, theater, and actual families. The workbook included defendant's responses to the questions and favorable feedback regarding defendant's responses. Defendant also provided a statement in allocution apologizing to the victims' families but also requesting the court to "recognize, as a child, some of us, not all of us, some of us get lost, become hopeless, confused, even intimidated at life itself" and that he was "not a heartless individual" as he once was. He then discussed the adolescent psychology work by Garbino and Steinberg used to create protections found in *Graham v. Florida*, 560 U.S. 48 (2010);

*Roper v. Simmons*, 543 U.S. 551 (2005); and *Miller*, 567 U.S. 460. Thereafter, defendant stated, "There has been nothing psychological or otherwise that *** in any way hindered my ability to properly grow and develop, to be rehabilitated and reformed." He stated that he had changed since his incarceration and dedicated himself to being a positive productive force in the prison. While imprisoned, he never engaged in violence or used drugs. He was dedicated to his family and had been a father to his child. He asked the court to sentence him to 40 years in order for him to "continue to develop and grow to the fullest of [his] human potential."

¶ 25    The State asked the court to impose a discretionary life sentence. It argued the murders were planned, and the actions were not impulsive. The conduct during the three separate attacks, which resulted in three people dying, revealed irretrievable depravity and permanent incorrigibility as evidenced by the cooling off periods in between the incidents. The State also argued that defendant's IDOC records revealed him as a threat to the community and someone who had not changed. Defendant was 17 when the murders occurred. He was relatively close to adulthood. He had no negative home and family environment growing up. While the neighborhood where he lived was going bad, he was in a loving supportive family, and that factor went against him because there was nothing to explain how he was different from any other child who did not do these heinous things. While familial and peer pressure was an issue, defendant's participation level was high and he "personally pulled the trigger on those two boys" who were the same age as defendant.

¶ 26    Defense counsel first addressed the IDOC records stating there was no illusion that IDOC was "a place to warehouse people" which caused people to act in a way they normally would not and that violations in IDOC were not infractions "in the normal world" and should not be "seriously considered" by the court. Counsel then addressed factors relating to youth and conceded the facts showed depravity, incorrigibility, and corruption but argued they did not show

irretrievable depravity, permanent incorrigibility, and irreparable corruption because the study of juvenile brains shows they were not fully developed and "[t]eenagers can be impulsively driven when rewards and emotions are implicated, and especially when their friends are involved." "The key issue is that the act may have been due, in part, to brain immaturities that at a later time in life, the decision would not have been made." Defendant's actions occurred while his brain was still forming and the studies showed that defendant's actions at age 17 were not indicative of irretrievable, permanent, or irreparable behavior. Counsel asked the court to impose a total sentence of 40 years' imprisonment.

¶ 27 The court considered the juvenile statutory factors, factors in aggravation and mitigation, the arguments of counsel, defendant's statement of allocution, the victim impact statements, the evidence presented, the PSI, and the factors outlined in section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West 2022)). It noted defendant was 16 or 17 and that testimony from the prior hearing revealed peer pressure by his cousin Contrell. It found the family situation was not abusive and that defendant had a supportive family. When addressing the person's potential for rehabilitation and circumstances of the offense, the court could not "imagine anything worse than what's happened in this situation." The degree of participation revealed defendant "was actively participating. He's the one who pulled the trigger." After noting defendant's statement of allocution, the court expressed its belief that defendant was able to participate in his defense and he spoke "very well." It also considered the exhibits.

¶ 28 The court found there was a need for deterrence, saying, "Society cannot tolerate actions like this." It considered the chronological history, noting the three robberies over three months. It found defendant's conduct showed irretrievable depravity, permanent incorrigibility, and

10

irreparable corruption beyond the possibility of rehabilitation. Thereafter, the court sentenced defendant to natural life without the possibility of parole in both cases.

¶ 29 The court further stated,

"For the record, I am familiar with the studies of the brain at 16, 17, and 18, that they are not fully developed. But certainly, the actions of this man, they were not the actions of somebody who didn't know what they were doing.

So I do not think that a sentence of 40 years or lower is appropriate for this. So I am going to give the two life sentences again."

Defendant timely appealed.

¶ 30                                    II. ANALYSIS

¶ 31 On appeal, defendant argues that his life sentences were unconstitutionally excessive under the eighth amendment (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). In support defendant contends that his life sentences reflect the sentencing court's failure to properly apply the juvenile sentencing factors now codified at section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West 2022)). Defendant acknowledges that he forfeited these arguments by failing to raise them in a postsentencing motion. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). However, he requests plain error review.

¶ 32 Plain error review is warranted when "the evidence at the sentencing hearing was closely balanced, or *** the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 544. However, the court must first find evidence of plain error. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

¶ 33    Citing *People v. Burns*, 209 Ill. 2d 551, 560 (2004), and *People v. Hale*, 2013 IL 113140, ¶ 15, defendant argues that because he raises constitutional violations, our standard of review of the court's sentencing determination is *de novo*. In response, citing *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15, the State argues our standard of review is an abuse of discretion. Because defendant's challenge to his sentence amounts to an excessive sentence challenge, we find the abuse of discretion standard applicable.

¶ 34    To provide context for defendant's claim, it is necessary to elucidate what *Miller* requires pursuant to the eighth amendment of the United States Constitution. Over the last 16 years, the United States Supreme Court has advised that there is a genuine risk of a disproportionate punishment when juveniles receive the harshest sentences available, because juveniles are constitutionally different than adults. *Miller*, 567 U.S. at 471-72. In *Miller*, the Supreme Court held that the constitution requires sentencing courts to consider youth and its attendant circumstances before imposing a sentence of life without parole for juveniles. *Id.* at 489-90. Our legislature codified the requirement to consider those characteristics, including:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;
>
> (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;
>
> (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;
>
> (4) the person's potential for rehabilitation or evidence of rehabilitation, or both;
>
> (5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105 (West 2022).

¶ 35    While *Miller* requires courts to consider youth and its attendant circumstances before imposing a life sentence, the Court subsequently made clear that resentencing is not required in every case that a juvenile receives a sentence of life without parole. *Montgomery v. Louisiana*, 577 U.S. 190, 211 (2016). Rather, *Miller* only requires a sentencing court to follow a discretionary sentencing procedure—*i.e.*, considering an offender's youth and attendant characteristics—before imposing a sentence of life imprisonment. *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S. Ct. 1307, 1316 (2021). In doing so, the sentencing court need not make a finding of permanent incorrigibility or any other specific finding. *Id.* at ___, 141 S. Ct. at 1318; *People v. Dorsey*, 2021 IL 123010, ¶ 40. Accordingly, "a discretionary sentencing scheme that allows a court to consider youth and its attendant characteristics is 'constitutionally sufficient.' " *People v. Wilson*, 2023 IL 127666, ¶ 42 (quoting *Jones*, 593 U.S. at ___, 141 S. Ct. at 1313).

13

¶ 36    Defendant here has not argued that the sentencing court was prevented from using its discretion or failed to consider his youth or any other statutory factor attendant thereto. As such, he did not assert a constitutional argument under *Miller*.[1]

¶ 37    Defendant's contentions on appeal are essentially an excessive sentence argument, as they pertain to the weight given to each factor rather than a failure to consider a pertinent factor or consideration of an improper factor. See *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 69 (although defendant casts his argument "in a constitutional framework," it is an excessive sentence argument where he "disagrees with the length of the sentence imposed *after* the court considered those factors and provisions, and, in effect, the weight the court gave them" (emphasis in original)). Where defendant merely argues that the court failed to adequately consider the mitigating factors and potential for rehabilitation before imposing sentence, the standard of review is an abuse of discretion. See, *e.g.*, *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000).

¶ 38    This court and another appellate district have recently rejected an argument that "*de novo*" review applies to sentencing challenges under the proportionate penalties clause. *People v. Etherton*, 2017 IL App (5th) 140427, ¶¶ 17-21 (court rejected defendant's argument that the abuse of discretion standard of review for sentences should be abandoned because it is inconsistent with the plain language of the proportionate penalties clause); *People v. Colon*, 2018 IL App (1st) 160120, ¶ 72 (same). We agree and follow the binding Illinois Supreme Court precedent establishing that "absent an abuse of discretion by the trial court, the sentence may not be altered on review." *Stacey*, 193 Ill. 2d at 209-10; see *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

---

[1]Defendant also forfeited such argument by not asserting it on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). We further note such argument would be meritless as the court explicitly addressed the statutory factors and scientific research regarding the brain maturity of juveniles, before imposing the discretionary life sentences. As such, defendant received the constitutionally required procedure under *Miller*. See *Wilson*, 2023 IL 127666, ¶ 44.

¶ 39    An abuse of discretion exists when a sentence—that falls within the statutorily prescribed range—is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210 (citing *People v. Fern*, 189 Ill. 2d 48, 54 (1999)). "The spirit and purpose of the law are promoted when the trial court's sentence reflects both the seriousness of the offense and gives sufficient consideration to the defendant's rehabilitative potential." *Etherton*, 2017 IL App (5th) 140427, ¶ 28. Because the trial court has a better opportunity to observe witnesses' credibility and demeanor than a reviewing court which relies on a cold record, we give great deference to the trial court's sentencing decision and will not substitute our judgment for that of the trial court merely because we would have balanced the sentencing factors differently. *Alexander*, 239 Ill. 2d at 213.

¶ 40    Here, the sentencing court expressly considered defendant's youth, including his age when the crimes were committed and its familiarity with the studies of juvenile brains between the ages of 16 and 18. It further noted the peer-pressure influence of defendant's cousin. However, the court also noted it was defendant who pulled the trigger killing Shane Storm and Matthew Whitacre and found defendant's actions "were not the actions of somebody who didn't know what they were doing." Evidence regarding defendant's rehabilitative potential was undermined by his IDOC records revealing numerous citations and gang affiliation while incarcerated.

¶ 41    Contrary to defendant's contention that his parents were neglectful as evinced by their failure to act despite their knowledge of his decline in school, the court found defendant's family supportive and not abusive. While defendant's mother testified at the second sentencing hearing that defendant lacked supervision, she explained her absence was due to work. Her other testimony indicated that she would search for defendant "all night" when he would "run around with his

15

friends." The PSI also noted that defendant's childhood revealed no abuse. The testimony and evidence supported the court's conclusions.

¶ 42    While the court found defendant able to participate in his defense, defendant argues that his youth and immaturity undermined his ability to participate in his defense by citing an American Bar Association article stating 60% of those polled at an age range of 11-13 believed admission of a crime was the correct response to police interrogation and less than 20% did at age range 18-24. It does not appear the cited materials were submitted to the trial court, and we therefore will not consider them. See *People v. Mehlberg*, 249 Ill. App. 3d 499, 531-32 (1993) (refused to consider studies that were "an attempt to interject expert-opinion evidence into the record" on appeal that was neither considered by the trial court nor subject to cross-examination). However, even if the materials were contained in the record, defendant fails to explain how the findings of the studies favorably apply to him. The studies addressed confessions from juveniles aged 11-13 and adults aged 18-24, which provides no insight for the case at bar, in which defendant was turning 17 or turned 17 during the three incidents. Importantly, the statutory factor addresses defendant's participation in his defense, not his actions leading up to the hearing.

¶ 43    Here, the trial court noted that defendant spoke "very well" and believed defendant was able to participate in his defense. No evidence to the contrary was submitted. Finally, the sentencing court specifically stated that it considered defendant's statement in allocution in which defendant expressed his remorse and apologized to the families.

¶ 44    While defendant's argument on appeal addresses only the factors in section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West 2022)), other factors were also relevant to the court's sentencing decision. The court specifically noted the need for deterrence and the chronological history of the three crimes being committed over three months.

16

¶ 45      The fact that defendant was a juvenile when the crimes were committed is not dipositive. *People v. Cretton*, 86 Ill. App. 3d 182, 185 (1980) ("A defendant's rehabilitative potential, while significant, is not the sole dispositive factor in sentencing."). There was evidence of peer pressure but also evidence of individual choice, as defendant travelled back and forth from his home in Indiana to visit his cousin in Illinois and personally discharged a firearm killing two people. The seriousness of the crime also supports the court's decision, as defendant committed offenses through three incidents occurring over one summer. While the court must consider defendant's rehabilitative potential and youth and attendant circumstances, it is not required to give those factors more weight than it gives aggravating factors, such as one of the most important factors— the seriousness of the offense. *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 32. Given this record, we find the court did not abuse its discretion and defendant's sentence was not greatly at variance with the spirit and the purpose of the law.

¶ 46      As noted above, under both prongs of the plain error doctrine, defendant must first show a clear and obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Here, no error is shown, and therefore, the procedural default will be honored. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). As such, we affirm the sentences imposed by the trial court.

¶ 47                                  III. CONCLUSION

¶ 48      For the foregoing reasons, we affirm the trial court's sentences.


¶ 49      Affirmed.

17